397 F.Supp. 894 (1975)
NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC., et al.
v.
James R. SCHLESINGER, Secretary of Defense, Howard H. Callaway, Secretary of the Army.
Civ. A. No. 75-1168.
United States District Court, E. D. Pennsylvania.
July 22, 1975.
Paul Breen, Philadelphia, Pa., for plaintiffs.
C. Oliver Burt, III, Chief, Civ. Div., U. S. Atty., Philadelphia, Pa., Arnold A. Vickery, Asst. to Gen. Counsel, Washington, D. C., for defendants.

MEMORANDUM AND ORDER
NEWCOMER, District Judge.
We have before us a motion by plaintiffs for a final injunction against the closing of the Frankford Arsenal until such time as the Secretary of Defense or the Secretary of a military department gives Congress a full report of the facts and justification for such closing, pursuant to Section 613 of the Military Construction Authorization Act of 1967, 80 Stat. 757, 10 U.S.C. § 2662, note (hereafter "Section 613"). For the reasons set forth below, we have determined that we must deny plaintiffs' motion.
The Frankford Arsenal is a federal facility operated by the Department of *895 the Army in Philadelphia, Pennsylvania, employing approximately 3,500 civilians, with an annual payroll of approximately $57,000,000. On November 22, 1974, the Secretary of Defense announced 111 separate military base closure/realignment actions, one of which was the closure of the Frankford Arsenal. The announced justification for the closure, which will result in the transfer or reduction in force of the 3,500 civilian jobs at the Arsenal and the transfer and consolidation of the research and development functions presently performed at the Arsenal to other Army installations, was that such closure was necessary as an economy move.
On approximately November 19, 1974, prior to the above public announcement, the Secretary of the Army personally briefed the Congressmen from the Philadelphia area of the impending announcement about the closure of the Frankford Arsenal. On November 21, 1974, the Department of the Army sent to the Speaker of the House and President Pro Tempore of the Senate, over the signature of Harold L. Brownman, Assistant Secretary of the Army, a memorandum entitled "INFORMATION FOR MEMBERS OF CONGRESS
U. S. ARMY INSTALLATION CLOSURE AND DEPOT SYSTEM REALIGNMENT ACTIONS."
This memorandum stated, in relevant part:
Secretary of the Army Howard H. Callaway today announced plans to realign the U. S. Army Materiel Command (AMC) depot system; to close Frankford Arsenal, Philadelphia, Pennsylvania; and to make Fort Hamilton, New York, a sub-installation of Fort Dix, New Jersey. These actions are designed to eliminate marginal facilities, to reduce overhead costs, to use available resources more efficiently and effectively, and to strengthen military capabilities. The actions will make available for reallocation to the Army combat structure funds up to $115 million annually, and up to 340 military and 7300 civilian manpower support spaces.
Current financial constraints dictated that the Army reevaluate all previously considered base closures involving significant cost reductions. An Army installation utilization and stationing study determined that Frankford Arsenal is too outmoded and too costly to continue operating. Additionally, Frankford Arsenal was one of the installations examined by the Army Materiel Acquisition Review Committee (AMARC) and by the current AMC study of AMARC recommendations. While some consideration was given to establishing Frankford Arsenal as an Armaments Development Center (ADC), the AMC study has gone far enough to determine that, if an ADC were established, Frankford Arsenal would be the least cost effective of all installations being considered. Accordingly, Frankford Arsenal will be closed by the end of FY 77.
The Department of the Army sent the above memorandum pursuant to Section 613 of the Military Construction Authorization Act of 1967, supra, which provides in relevant part:
"No camp, post, station, base, yard or other installation under the authorrity of the Department of Defense shall be closed or abandoned until the expiration of thirty days of continuous session of the Congress following the date on which the Secretary of Defense or the Secretary of a military department makes a full report of the facts, including the justification for such proposed action to the Congress."
On April 23, 1975, plaintiffs brought this law suit seeking to enjoin the proposed closure of the Frankford Arsenal because of the alleged failure of the defendants to give Congress the full report and justification for the proposed closure that Section 613 of the Military Construction Authorization Act of 1967 requires under the language quoted above. Plaintiffs' complaint also contains *896 a prayer for this Court to enter a declaratory judgment that the memorandum furnished to the Department of the Army, and marked as Exhibit "A" to plaintiffs' complaint does not comply with the requirements of the above-mentioned Section 613.
Plaintiffs consist of the following three groups:
(1) Seven local congressmen;
(2) Eleven named employees of the Department of the Army at the Frankford Arsenal;
(3) Both the National and Local of the Unions designated as the lawful bargaining representatives of the civilian employees of the Frankford Arsenal.
While plaintiffs originally requested a preliminarily injunction, both plaintiffs and defendants subsequently agreed to dispense with any preliminary injunction and to proceed instead to a hearing on a final injunction. This Court held such hearing on May 29, 1975, after which both parties submitted briefs to the Court in accordance with a time table agreed upon by the Court and the parties at the conclusion of the hearing. This Court then held final oral argument on plaintiffs' motion for an injunction, and on defendants' motion for summary judgment, on June 30, 1975.
As noted at the outset of this opinion, we have concluded we must deny plaintiffs' request for injunctive and declaratory relief. We so decide because we find no basis to conclude that Congress intended that federal courts, rather than Congress itself, should determine what constitutes in any given case the full report to Congress that Section 613 requires.
Section 613, while requiring that Congress receive a full report of the facts and justification for any proposed base closing, does not state who shall determine whether a report given in a particular case meets Section 613's requirements. Nor do we find any evidence of Congressional intent on this issue in the legislative history of Section 613 and its predecessors, which legislative history we have examined thoroughly. See especially the report by the House of Representatives, H.R.Rep. No. 956, 89th Cong., 1st Sess. (Sept. 3, 1965).
In the usual case, given the traditional role of courts as interpreters of statutes against particular factual situations, one might presume that the legislature intended the courts to interpret the statute in any given factual situation unless the legislature expressly states otherwise. In this case, however, we believe this presumption should not apply, and that courts instead should refrain from attempting to determine whether any given report satisfies Section 613's requirements absent positive evidence of Congressional intent to vest the courts with such responsibility.
To begin with, we see no reason to presume that Congress would vest in a body other than itself the decision whether Congress had received a full report on any proposed base closing. Congress enacted Section 613 because Congress believed it needed certain information on any proposed base closing in order to perform certain tasks.[1] See, e. g., H.R.Rep. No. 956, 89th Cong., 1st Sess. (Sept. 3, 1965).
We see no reason why Congress would believe a Court would know better than than Congress whether Congress had received in any particular case the information it needed.
Moreover, as already noted[2], one of the reasons Congress enacted Section 613 was a very strong desire by Congress to enchance its position vis-a-vis the *897 Executive Branch in matters of national security and defense. As the above legislative history shows, Congress believed the Constitution vested it with a co-equal status with the Executive in such matters, and Section 613 was meant to insure that Congress received the information it needed to perform this role. Given this definite reason behind Section 613's enactment we find no reason to presume that Congress nonetheless intended to dilute Section 613's promise by vesting in a body other than Congress the decision whether Congress had received the required information in the case of any particular base closing. Such power in a body other than Congress would allow for the possibility that such other body might decide in a particular case that Congress had received the required information, even though Congress believed otherwise. Such possibility would in turn allow for the possibility that Congress would not receive needed to do its job, and the underlying purpose of Section 613 would thereby in that case the information it felt it have been frustrated.
Moreover, the Constitution vests authority over decisions concerning the deployment of national military resources, and thus the continued operation or closure of individual military bases, in the Executive and Congress,[3] but not the Judiciary. We believe that in light of this constitutional and traditional absence of the courts from this area, Congress would not have left it to inference or presumption if Congress had intended the courts to become involved in the process of military base closures.
Indeed, in the considerations and debates in the evolution of Section 613, Congressional concern focused extensively and precisely on the issue of the Constitutional allocation of authority in the matter of decisions to close or continue military bases, and not once do we find any hint of a belief or intent that the courts have a place in this matter or should be involved. See, e. g., S.Rep. No.338, 89th Cong., 1st Sess., at 48-49 (June 21, 1965). Countless mentions and discussions of the Executive and Congress appear in such legislative history, but not once is the Judiciary mentioned in any respect.
Plaintiffs urge that they ask us only to decide whether the Executive branch has complied with statutory requirements, but do not ask that we become involved in the policy decision to close a base. We recognize this point, but it does not change our presumption that Congress did not intend judicial involvement with Section 613 and the matter of base closings. An injunction by us to halt a base closure would have the same effect on such closure regardless whether we issued it for policy or statutory interpretation reasons, and it is this effect or interference with a proposed base closure which we do not believe we can presume Congress intended.
Our conclusion on this point rests to a great extent on the fact that Congress denied itself the power to halt a proposed base closing. H.R. 8439, Section 608, 89th Cong., 1st Sess. (1965), the original predecessor of the present Section 613, provided that either House of Congress could halt a proposed base closing by simple majority resolution. The House passed this provision, but the Senate deleted it, on grounds that it might allow what the Senate believed would be unwise interference with the quick and efficient adjustment of military resources to changing demands. See, S. Rep.No.338, 89th Cong., 1st Sess., at 48-40 (June 21, 1965). The House accepted the Senate's deletion, and the bill ultimately passed contained no provision for any Congressional halt of a base *898 closure. H.R. 8439, Section 611, 89th Cong., 1st Sess. (1965).[4]
Given such action by Congress, we do not think we can reasonably presume Congress intended, without expressly so stating, that a court would have the same power peremptorily to halt a base closing that Congress denied itself. An injunction to halt any proposed closing would have the same effect on military resource adjustment that a halt resulting from Congressional resolution would have, and we can not see why Congress would have less concern with allowing such effect to be caused by judicial injunction than by Congressional resolution.
In addition, we find reason not to presume Congress intended judicial enforcement of Section 613 from evidence in the legislative history of that statute that Congress believed, or at least hoped, that it would encounter no problem with the Executive branch's furnishing the report Section 613 requires. In passing the immediate predecessor to the present Section 613,[5] the House of Representatives' report stated that the President had given his assurance that no base closing would be made without the required notice to Congress. In addition, the report then expressed the hope that the Secretary of Defense also recognized Congress as a co-equal partner with the Executive in matters of base closings, and would give the required notice, so that no further, stronger legislation would be necessary. See, H.R.Rep.No. 956, 89th Cong., 1st Sess., at 61, 62 (Sept. 3, 1965).
Such expression suggests to us that Congress felt it would deal with non-compliance with Section 613's requirements if such non-compliance occurred, rather than intending that judicial injunction should be the remedy for noncompliance.
The only reason we can see for having the courts get involved with Section 613 is the relative speed with which a court could act with respect to non-compliance with that section's requirements, compared to the time it would take Congress to act. A court can enjoin much more quickly than Congress could legislate to halt a proposed base closing.
We cannot infer that such reason prompted Congress to intend judicial involvement with Section 613, however, given the other considerations mentioned above. We refer especially to the distinct refusal by Congress even to vest itself with the power to halt a closing by majority resolution of either House, a power that would have enabled Congress to halt a closing virtually as quickly as could any court injunction.
Given the above-mentioned considerations, we do not think it reasonable to presume Congress intended courts to interpret and enforce Section 613 and its requirements. If this presumption is wrong, and Congress intends courts to interpret Section 613 in individual *899 cases, Congress may so instruct the courts. Given the presumption that we have reached, however, and in the absence of any expression of such Congressional intent in either Section 613 or its legislative history, we conclude we may not attempt to decide whether Section 613 has been complied with in this particular case.
While we decide this case on the grounds just set forth, we would add that we believe the issue of whether the requirements of Section 613 have been met, at least in the circumstances of this case, might well be considered a nonjusticiable issue because of the difficulty presented in judicially attempting to decide what degree or extent of information Section 613 requires.[6]
This difficulty arises from the complete absence in Section 613 of any standards by which a court can determine the degree of information necessary to constitute a "full" report in any particular case, and the lack of any other objective criteria by which a court can make such a determination. In essence, the only decisive standard by which to judge whether any particular report given Congress meets Section 613's requirements is subjective Congressional opinion. That is, in reality Section 613 requires that degree of information which Congress desires, or that degree of information which will satisfy Congress.
Absent express Congressional determination on the adequacy of any particular report, however, a court has no way to ascertain the adequacy of that report in Congress' opinion. A court cannot, for example, intuit or otherwise "divine" the opinion of Congress.
While the seven Congressional plaintiffs in this case contend the report furnished Congress in this case is inadequate under Section 613, that statute speaks of a full report to Congress, which we read to mean Congress as a whole.[7] We do not, therefore, believe we could judge the report in question here inadequate under Section 613 because the seven Congressional plaintiffs here believe it so.
Nor do we find any evidence that the seven Congressional plaintiffs here have authority to speak for the entire Congress. We have in fact no evidence that these plaintiffs raised the issue of the report in question here with the Congress as a whole or the Congressional leadership.
In addition, putting aside the issue of the justiciability in cases generally of the adequacy of a report under Section 613, we have in this case a fact which argues at the very least for the non-justiciability of the adequacy of the report in question in this particular case. In this particular case, the Speaker of the House, in a letter to the Department of the Army acknowledging receipt of the report in question here, expressly referred to it as the full report which Section 613 requires. Moreover, the report was subsequently accepted on the floor of the House.
Plaintiffs contend we should give no or little weight to the Speaker's letter and the floor acceptance of the report, since plaintiffs contend these actions were done with no true evaluation of whether the report complied with Section 613. It hardly stands, however for a court to attempt to decide whether to attribute to some action of Congress or a Congressional leader a meaning other than the meaning the action objectively conveys. If we were to reach the merits of the sufficiency under Section 613 of defendants' report in this case, the above described letter of the Speaker and *900 the floor acceptance by the House might dictate strongly in favor of finding the report adequate. Since we do not reach this issue, suffice it to say that these actions by the Speaker and the House dictate strongly in favor of our conclusion that a court could face only great difficulty in attempting to decide the adequacy under Section 613 of a report in any particular case, and that this degree of difficulty could render such issue of a report's adequacy nonjusticiable.[8]
In reaching our decisions about Congressional intent as to Section 613 and the justiciability of that section, we would add that we have not failed to consider the temporary restraining order issued by Judge Pettine of the United States District Court for the District of Rhode Island in a case similar to this. National Association of Government Employees, Inc., et al v. Elliot L. Richardson, et al (June 12, 1973). Judge Pettine expressly stated in his opinion accompanying that order that the case presented issues of a highly complex nature, and that he entered the temporary restraining order only so as to preserve the status quo for the moment. Judge Pettine's order thus not only did not expressly deal with the issues we have treated in our opinion, but also can not be read to imply a conclusion on these issues different than those which we have reached.
Accordingly, for the reasons stated above, we must deny plaintiffs' request for an injunction and for declaratory relief.
NOTES
[1] These tasks included the avoidance of appropriations for bases destined to close, the minimization of the adverse impact on constituents of the areas where bases designated for closing were lcoated, and most important, the exercise by Congress of its perceived Constitutional role as co-equal partner with the Executive in matters of national defense and the maintenance of military resources.
[2] Note 1, supra.
[3] The Executive derives its constitutional authority in this area from Article II, Section 2, Clause 1, which designates the President as Commander in Chief. Congressional authority in this area derives from Article I, Section 8.
[4] Congress ultimately deferred even further in favor of not halting or even delaying base closings the Executive determined necessary. H.R. 8439, Section 611, cited supra, provided that the announcements to the Congressional Armed Services Committees of proposed base closings required before such closings could be made could be submitted to such Congressional Committees only during the period from January 1 to April 30.

President Johnson vetoed this bill on grounds it would effectively prohibit actions to close bases during the other eight months of the year.
Congress then passed H.R. 10775, which did not contain such limit on the Executive. Such bill was signed into law as Pub.L. No. 89-188, 79 Stat. 793 (Sept. 16, 1965), as the Military Construction Authorization Act of 1965.
[5] This provision, Section 611 of H.R. 10775, 89th Cong., 1st Sess. (1965), contained Section 613's present language except that it required the full report and justification for a proposed base closing to be given to the Committees on Armed Services of the Senate and House of Representatives, rather than to "Congress", as Section 613 requires. The substitution of the Congress for the Armed Services Committees as recipient of the reports required by Section 613 occurred in 1967 (with Section 613 of Pub.L. No. 89-568).
[6] In deciding whether a claim is justiciable, a court must determine whether "the duty asserted can be judicially determined, and whether protection for the right asserted can be judicially molded." Baker v. Carr, 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962).
[7] Section 613 originally required the report to be given to the Armed Services Committees of both Houses of Congress, but was then amended to substitute "Congress" for the Armed Services Committee. Section 613 of Pub.L. No. 89-568.
[8] We have read the cases plaintiffs cite on the justiciability issue, but they do not change the views we express in this opinion on the justiciability of this case. Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973), held that the issue in that case, whether an executive official of the Office of Economic Opportunity had exceeded his authority in directing a cessation of OEO funding of certain programs prior to any legislation terminating those programs and prior to the expiration of the funding authorization then in effect, did not present a non-justiciable political question. We readily agree, but the decision does not apply to the issues in this case.

Phillips, which involved the issue of whether the official in question had acted ultra vires in ordering a halt to funding of programs for which Congress had expressly legislated funding authorization, does not shed light on the justiciability of whether a report meets Section 613's requirements, when Section 613 does not define those requirements and the only decisive measure of the requirements is the subjective determination of the Congress.