**NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES et al.**

v.

**Donald RUMSFELD et al.**

**Civ. A. No. 76–1430.**

United States District Court,
E. D. Pennsylvania.

July 30, 1976.

Paul Breen, Philadelphia, Pa., for plaintiffs.

Arnold A. Vickery, Brian B. O'Neill, Assts. to the Gen. Counsel, Dept. of the Army, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This action was brought by the National Association of Government Employees, the City of Philadelphia, and numerous individuals, to enjoin the closing of the Frankford Arsenal because the Department of the Army had not complied with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. ("NEPA"). The defendants have filed a motion to dismiss the action on the grounds that the plaintiffs lack standing, that they fail to state a claim for relief under NEPA, and that they are barred from obtaining equitable relief by laches. On May 24, 1976, we held a hearing on the defendants' motion to dismiss and the plaintiffs' motion for preliminary injunction. By agreement of the parties, this hearing was consolidated with the trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. We hold that the plaintiffs have failed to state a claim for relief under NEPA, and that their action must be dismissed.

## FACTUAL BACKGROUND

On November 22, 1974, the United States Department of Defense and the Department of the Army announced their decision to close Frankford Arsenal, and to transfer its missions and functions to other Federal facilities. The closing is to be completed by July, 1977, and will result in the elimination of approximately 3,500 civilian jobs in Philadelphia. The Army expects that the closing of the Frankford Arsenal will accomplish savings of approximately $24 million per year, after the one-time costs associated with the closing are incurred. The closing of the Frankford Arsenal is an integral part of the Army's plan to realign and restructure the entire armament community, which was approved on December 2, 1975.

The defendants have admitted that the closing of the Frankford Arsenal is a major Federal action, and that it is part of a major realignment of components involving numerous installations and activities. The defendants have also admitted that no Environmental Impact Statement was ever prepared, and that the studies and reports used in arriving at the decision to close Frankford Arsenal were designated "For Official Use Only—Close Hold." This designation was intended to prevent persons who were not actually involved in the decision making process from examining the studies and reports. The decision to close Frankford Arsenal was made without consulting State or local agencies or private groups, and no outside group was informed of the Army's plans to close Frankford Arsenal until that decision was announced on November 22, 1974.

Both before and after November 22, 1974, numerous studies were made concerning the closing of the Frankford Arsenal. The initial study (Defendants' Exhibit 2) had concluded that the closing would have no significant impact on the environment, although it might be controversial for social

and economic reasons. This study was reviewed by various offices in the Department of the Army, and was updated in November, 1974 (Defendants' Exhibit 4). The Army also contracted with Arthur D. Little, Inc. to perform a study of the impact on the Philadelphia area of the closing of the Frankford Arsenal (Defendants' Exhibit 5). This study concluded that the closing would have no adverse environmental effects, and would have a negligible impact on the overall economy of Philadelphia, due to the size of the City. These studies (Defendants Exhibits 2 through 7) were in existence prior to the Army's decision to close Frankford Arsenal, and they show that the Army did consider environmental and economic impacts of the decision.

After the initial decision to close Frankford Arsenal was announced on November 22, 1974, the Army continued to reevaluate the effects of the closing. (Defendants' Exhibits 8 through 11). The more recent environmental assessment (Defendants' Exhibit 10) concluded that there would be no significant adverse environmental effects, but noted that there could be' adverse effects on law enforcement, fire protection, judicial services, child care, mental health services, and transportation. The earlier environmental assessments had not discussed these possible impacts. The more recent study also concluded that the closing of the Frankford Arsenal could have a significant socio-economic impact, and again this issue was not discussed in the initial environmental assessment.

Frankford Arsenal comprises 264 buildings on 110 acres, bounded on one side by the Delaware River. At trial the plaintiffs presented testimony from representatives of the police and fire departments of Philadelphia that if the Frankford Arsenal were completely abandoned, the City would have to provide additional fire and police services because vacated buildings can become a major source of crime and fire problems. The increased costs for fire protection have been estimated as approximately $550,000 per year, and for police protection, approximately $1.4 million per year. However, a witness for the Army testified that a caretaker force would remain at Frankford Arsenal after it was closed, and would include the present fire company and a guard force. This would reduce or possibly eliminate the cost increases projected by the plaintiffs.

The closing of the Frankford Arsenal undoubtedly will have an important economic impact on the Philadelphia area. The Army estimated that the area would incur losses of more than $107 million in wages, purchases of goods and services, school subsidies and taxes. Moreover, the total impact of the loss will be much greater due to the multiplier effect. The loss of 3,500 jobs will aggravate unemployment in an area where unemployment is already over 10%.

Any delay of the Army's decision to close Frankford Arsenal would delay the entire process of restructuring the armament community that has already begun. Any such delay would entail lost savings of approximately $3 million per month. In addition, substantial sums have already been spent to implement the decision to close Frankford Arsenal, and several hundred employees have been terminated or transferred.

Finally, the plaintiffs in this action have been involved in two prior lawsuits to prevent the closing of the Frankford Arsenal. *National Association of Government Employees v. Schlesinger,* 397 F.Supp. 894 (E.D.Pa.1975), aff'd, 523 F.2d 1051 (3d Cir. 1975); *City of Philadelphia & Brown v. Rumsfeld,* C.A. No. 75–1405 (E.D.Pa. November 3, 1975), aff'd 535 F.2d 1245, C.A. No. 76–1090 (3d Cir. 1976). The plaintiffs had ample opportunity to present their NEPA claims in these earlier suits, before the defendants decided to restructure the entire armaments community.

## LEGAL CONCLUSIONS AND DISCUSSION

Initially the defendants argue that the plaintiffs are precluded from obtaining injunctive relief because they are guilty of laches. Laches is applicable where there is inexcusable delay by the plaintiff coupled with prejudice to the defendant caused by such delay. *See, e. g., Gardner v.*

*Panama Railroad Co.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 96 L.Ed. 31 (1951); *Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1258 (3d Cir. 1974). Here the elements necessary for laches seem to be present. The closing of Frankford Arsenal was announced on November 22, 1974, but this action was not filed until May 6, 1976. Moreover, several of the same plaintiffs, represented by the same counsel, were involved in two earlier actions challenging the Army's decision to close Frankford Arsenal and could have raised a NEPA claim at that time. Since the earlier suits, the defendants have spent money and made plans to restructure the entire armaments community on the assumption that the decision to close Frankford Arsenal was valid. These actions constitute sufficient legal prejudice to justify the application of laches.

The plaintiffs have argued that their delay is not unreasonable because the defendants made the decision to close Frankford Arsenal in secret. However, an element of the plaintiffs claim is that this secrecy itself was unlawful. The very absence of environmental assessments should have alerted the plaintiffs to the possibility that NEPA had been violated. Yet the plaintiffs did not include a NEPA claim in either suit, and apparently they did not even attempt to investigate the possibility of a NEPA violation until shortly before this suit was filed. Under the circumstances, it is difficult to see how the plaintiffs' delay can be viewed as anything other than unreasonable and inexcusable.

Other courts faced with similar factual situations have refused to grant injunctive relief on the basis of the plaintiff's laches. See *Shiffler v. Rumsfeld,* C.A. No. 75–2129 (D.N.J. May 4, 1976); *Iowa Student Public Interest Research Group v. Callaway,* 377 F.Supp. 714, 720 (S.D.Iowa 1974); *Smith v. Schlesinger,* 371 F.Supp. 559 (C.D.Cal.1974). Although we believe that the elements necessary for a finding of laches are present in this case, we will not dismiss the plaintiffs' action on that ground alone. The closing of the Frankford Arsenal is an important issue to the plaintiffs, as is indicated by the fact

that this is the third suit they have brought to challenge the Army's decision. Consequently, the plaintiffs deserve a discussion of the merits of their NEPA claim.

The defendants have moved to dismiss the complaint on the grounds that it does not state a claim under NEPA and that the plaintiffs lack standing. Both of these arguments involve essentially the same issue: whether the plaintiffs have stated claims of environmental impacts that are cognizable under NEPA and bring the plaintiffs within the zone of interests of that Act. We think that this issue can best be considered in the context of the defendants' contention that the plaintiffs have not stated a claim for relief under NEPA, and therefore we will not further consider the argument on standing.

■ NEPA requires that a detailed environmental impact statement be prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The defendants contend that the closing of Frankford Arsenal will not significantly affect the quality of the human environment, and that therefore NEPA does not apply. We agree with the defendants, and hold that the plaintiffs have failed to state a claim under NEPA.

The plaintiffs' primary claim of impact from the closing of the Frankford Arsenal is economic. Plaintiffs are concerned with the loss of jobs in the Philadelphia area, and the resulting economic loss. It cannot be denied that this economic impact will be significant. However, NEPA is concerned with impacts upon the human environment, and courts properly have rejected NEPA claims based on purely economic concerns. *Breckinridge v. Rumsfeld,* 537 F.2d 864, No. 75–2505 (6th Cir. 1976); *Maryland National Capital Park and Planning Commission v. United States Postal Service,* 159 U.S.App. D.C. 158, 487 F.2d 1029, 1037 (1973). The fallacy of the plaintiffs' expansive definition of "human environment" is apparent from the statement in their brief that "Congress obviously intended by its use of the phrase 'human environment' to require an

EIS [Environmental Impact Statement] in all situations where a major Federal action has a significant effect on humans." (Plaintiffs' Response to Defendants' Motion to Dismiss, at 43). Since nearly all major Federal actions significantly affect humans, plaintiffs presumably would require environmental impact statements for every major Federal action. This certainly goes far beyond the Congressional intent in enacting NEPA. See *Breckinridge v. Rumsfeld, supra.*

The fact that social or economic impacts alone are not enough to trigger the application of NEPA does not mean that such impacts are completely irrelevant. Many cases have recognized that when a federal action does have a significant environmental impact, social and economic impacts must also be considered in evaluating the action.[1] *See, e. g., Chelsea Neighborhood Associations v. United States Postal Service,* 516 F.2d 378, 388 (2d Cir. 1975); *Hanly v. Kleindienst,* 484 F.2d 448 (2d Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974) (Hanly III); *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (Hanly II); *Hanly v. Mitchell,* 460 F.2d 640 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (Hanly I). In all of these cases, the socio-economic effects were considered only in conjunction with impacts that were clearly environmental.

The plaintiffs have cited certain language from the Council on Environmental Quality ("CEQ") Guidelines to support their contention that economic impact is an environmental effect. The CEQ Guidelines provide as follows:

"Secondary or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. Many major Federal actions, in particular those that involve the construction or licensing of infrastructure investments (e. g., highways, airports, sewer systems, water resource projects, etc.), stimulate or induce secondary effects in the form of associated investments and changed patterns of social and economic activities. Such secondary effects, through their impacts on existing community facilities and activities, through inducing new facilities and activities or through changes in natural conditions may often be even more substantial than the primary effects of the original action itself. For example, the effects of the proposed action on population and growth may be among the more significant secondary effects. Such population and growth impacts should be estimated if expected to be significant . . . and an assessment made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water, and public services, of the area in question." 40 C.F.R. § 1500.8(a)(3)(ii).

First of all, this language deals with the contents of an environmental impact statement, not with the preliminary question of whether an action significantly affects the human environment. Thus, the CEQ Guidelines are consistent with those cases holding that if there is an impact on environment requiring the preparation of an environmental impact statement, that statement must also consider socio-economic impacts. Secondly, as we interpret the CEQ Guidelines, secondary effects are only important under NEPA because they may lead to indirect impacts on the environment ("the resource base"). For example, if a proposed Federal action will lead to population increases, the environmental impact of the increased population must be considered. The CEQ Guidelines do not indicate that socio-economic impacts alone are enough to require the preparation of an environmental impact statement.

■ Plaintiffs in this case have asserted two quasi-environmental impacts—that the

---

1. Department of Defense regulations are to the same effect:

    "Although the secondary socio-economic impacts are generally insufficient by themselves to require an EIS, these factors should be included in the statement, in the event an EIS is required."
    32 C.F.R. § 214.7(b)(2).

closing of Frankford Arsenal will necessitate increased fire protection, and that it will cause an increase in crime. Possible effects on police or fire protection fall into the category of social impacts, which are insufficient in themselves to implicate NEPA, although they certainly would have to be considered if an environmental impact statement was otherwise required. More importantly, both of these impacts will be minimized by the Army's decision to leave a caretaker force to provide police and fire protection after the Arsenal is closed, and its intention eventually to put the Arsenal to other uses or have it demolished. (Defendants' Exhibit 2, at EVA–6). Consequently, the possible effects on police and fire protection are not significant impacts on the human environment which would require the preparation of an environmental impact statement.

■ The plaintiffs have also argued that the defendants' own regulations required that an environmental impact statement be prepared. Department of Defense regulations provide that even though an action apparently will not have a significant effect on the environment, "an Environmental Impact Statement is to be written on a proposed action which is highly controversial because of its environmental aspects." 32 C.F.R. § 214.8(e). Although the closing of the Frankford Arsenal is controversial, the controversy is not because of environmental concerns, but rather because of the economic and employment impact the closing will have. The lack of environmental controversy is underlined by the plaintiffs' long delay in asserting a claim under NEPA. Certainly, the mere fact that a group of plaintiffs have challenged the closing on environmental grounds several years after the decision was announced is not enough to create the requisite environmental controversy. See *Hanly II, supra,* 471 F.2d at 830 n. 9A.

■ Another Department of Defense regulation states that an example of an action that could be a major federal action significantly affecting the quality of the human environment is "a major realignment of a component involving numerous installations or activities." 32 C.F.R. § 214.7(b)(2). Since the closing of the Frankford Arsenal is an integral part of the realignment of the entire armament community, this regulation is applicable. However, the regulation states only that such a realignment could significantly affect the quality of the human environment; it is not authority for the plaintiffs' contention that an environmental impact statement is necessarily required in this case.

■ Finally, the plaintiffs argue that the absence of public participation and the Army's use of "close-hold" classifications before making the decision to close Frankford Arsenal violated NEPA. Although NEPA does mandate public participation in the preparation of an environmental impact statement, the statute only applies to major federal actions significantly affecting the quality of the human environment. The statute does not impose any public participation requirement upon the threshold process of deciding whether NEPA applies at all, nor have we discovered any regulations concerning public participation in the environmental assessment stage. Consequently, the "close-hold" procedures adopted by the defendants did not violate NEPA.[2]

2. The cases cited by the plaintiffs to support their position that secrecy during the environmental assessment stage violates NEPA are not controlling. In *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975), the court held that the proposed action was a major federal action significantly affecting the quality of the human environment, so that the public participation requirements of NEPA applied, and were violated by the agency's secrecy. Here NEPA is inapplicable because the closing of Frankford Arsenal does not significantly affect the quality of the human environment. *Breckinridge v.*

*Schlesinger,* C.A. No. 75–100 (E.D.Ky. Oct. 31, 1975) did support the plaintiffs' argument, but the district court decision recently was reversed with orders that the case be dismissed. *Breckinridge v. Rumsfeld,* 537 F.2d 864, C.A. No. 75–2505 (6th Cir. 1976). In *Hanly II,* supra, 471 F.2d 823, the Second Circuit, over Chief Judge Friendly's dissent and without statutory or regulatory authority, imposed a requirement of public participation in the environmental assessment stage. The defendants have attempted, without much success, to distinguish *Hanly* on the basis that that case in-

Our conclusion that the defendants' decision to close the Frankford Arsenal did not violate NEPA is buttressed by several recent decisions involving NEPA-based challenges to Department of Defense realignments. Only two of these cases were decided in favor of plaintiffs, and both are distinguishable from the case at bar. *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975), concerned an Air Force decision to transfer approximately 3000 jobs to Scott Air Force Base in Illinois, which would result in an influx of about 10,000 persons. This would greatly overburden municipal services, such as sewage, and would necessitate housing construction. Coupled with these impacts on physical environment, the court also considered social and economic impacts, and concluded that an environmental impact statement was required. *Prince George's County v. Holloway,* 404 F.Supp. 1181 (D.D.C.1975), also involved an influx of persons with resulting impact on municipal services. The controversy in *Holloway* centered on the sufficiency of the environmental impact statement that had been prepared, since the parties apparently agreed that NEPA was applicable. Unlike the actions involved in *McDowell* and *Holloway,* the closing of the Frankford Arsenal will not cause an influx of a large number of people with obvious effects upon the environment, including impacts on public utilities and housing. Moreover, even social and economic factors may be somewhat less important here, since the Frankford Arsenal is located within a large city, while *McDowell* and *Holloway* involved impacts on small communities. Finally, and most importantly, *McDowell* and *Holloway* represent a minority position among those cases which have considered NEPA-based challenges to Department of Defense realignments.

In *Shiffler v. Rumsfeld,* C.A. No. 75–2129 (D.N.J. May 4, 1976), the court ruled that the agency decision that an environmental impact statement was not required was not arbitrary and capricious, and that even if it

had been, the plaintiffs were barred from equitable relief because of laches. Four other decisions rejected claims similar to those in this case, primarily on the basis that the proposed action would not have a significant impact on the environment. See *Breckinridge v. Rumsfeld,* 537 F.2d 864, C.A. No. 75–2505 (6th Cir. 1976); *NAGE v. Rumsfeld (Pueblo),* C.A. No. 75–1670 (D.D.C. May 14, 1976); *IMAGE of Greater San Antonio v. Rumsfeld,* C.A. Nos. SA–76–CA–116, SA–76–CA–117 (W.D.Texas May 13, 1976); *Prince George's County v. Schlesinger,* C.A. No. 75–590 (D.D.C. Nov. 7, 1975). *IMAGE of Greater San Antonio* involved a challenge to a reduction in force of approximately 1000 jobs at Kelly Air Force Base in Texas. In dismissing the plaintiffs' NEPA claims, the court noted that:

"NEPA is not a 'National Employment Policy Act.' Although, plaintiffs seek by 'linguistics' and 'etymology' to stretch the Act's coverage to embrace their own parochial interests, this type of effect cannot clearly be projected as having been within the contemplation of Congress. Construing the Act in this manner detracts from the long-term resources for whose protection NEPA was enacted and endangers its ultimate existence and vitality.

The reduction in force of civilian employees of the San Antonio Air Logistics Center does not involve any long-term impact, any permanent commitment of a natural resource, or any degradation of a traditional environmental asset. Instead the impacts of the RIF are limited in the nature to short-term personal inconveniences and short-term economic disruptions. These matters are simply not within the purview of the Act. . . ."
Slip Op. at 9–10 (Citation omitted)

The court used similar language in granting summary judgment for the defendants in *NAGE v. Rumsfeld (Pueblo), supra:*

"In the case at bar there is some dispute amongst the parties as to the degree of economic impact of the realignment.

volved major construction with the clear possibility of potential impacts on environmental

resources. We believe that *Hanly* was wrongly decided, and decline to follow it on this point.

There is, however, no allegation nor indication of any negative impact on the area's eco-systems. The realignment involves no construction, demolition, or commitment of primary environmental resources, but rather it will lessen noise, traffic, and solid waste disposal at facilities which, the Court has been informed, are already under environmental sanction by the State of Colorado." Slip op. at 9–10.

The same reasoning applies to the closing of the Frankford Arsenal. The closing will not have an adverse impact on the physical environment. In fact, if the closing has any environmental impact at all, it would be to diminish noise, traffic and air pollution. Admittedly, the closing will have significant socio-economic impacts, but such impacts are not the primary concern of NEPA. The plaintiffs have not raised substantial environmental issues, and therefore the procedural requirements of NEPA are inapplicable, and the action must be dismissed.

■ We should also point out that even if the plaintiffs had stated a claim under NEPA, the Army's decision that an environmental impact statement was unnecessary would not be set aside lightly. While there is some dispute concerning the appropriate standard of review to apply to an agency's determination that an environmental impact statement is not required,[3] in this case the Army's decision was not arbitrary or capricious, nor was it unreasonable. The Army performed numerous studies, all of which concluded that the closing of Frankford Arsenal would have no significant impacts on the environment. The plaintiffs offered no evidence of any environmental, as opposed to social or economic impacts, that would result from the closing of the Frankford Arsenal. Under these circumstances, the Army's decision would be upheld.

**3.** See this Court's decision in *Borough of Morrisville v. Delaware River Basin Commission,* 399 F.Supp. 469 (E.D.Pa.1975).