NATURAL RESOURCES DEFENSE COUNCIL, INC., The Parks Council, Inc., Hudson River Sloop Clearwater, Inc., Terence H. Benbow, Eleanor Todd, Ross Sandler, Paul Reitman, Wilberforce D. Simmons, Virdell M. Sanders, Antoinette C. Jackson, and Gloria Verdell, Plaintiffs,

v.

John O. MARSH, Jr., as Secretary of the Army, Department of the Army, John Lehman, as Secretary of the Navy, William J. Ryan, as Director of the Navy Resale and Support Office, Department of the Navy, and James G. Watt, as Secretary of the Interior, Defendants.

No. 81 CV 1942 (ERN).

United States District Court,
E.D. New York.

July 21, 1983.

Ross Sandler, James Thornton, Natural Resources Defense Council, Inc., Daniel Riesel, Mark A. Chertok, Winer, Neuburger & Sive, Marshall Beil, Karpatkin, Pollet & Beil, New York City, for plaintiffs.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y. by Patrick B. Northup, Asst. U.S. Atty., Brooklyn, N.Y., Edward J. Passarelli, Trial Atty., Dept. of the Navy, Lt. Col. S. Eisenberg, U.S. Army JAG, Brian Koula, Atty. Advisor, Dept. of the Interior, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Invoking primarily the Gateway National Recreation Area Act, 16 U.S.C. § 460cc *et seq.* ("Gateway Act"), plaintiffs brought this action against the Secretaries of the Army, Navy and Interior, and the Director of the Navy Resale and Support Office ("NAVRESSO"), seeking to enjoin NAVRESSO's occupancy of federal buildings located in the Fort Wadsworth military reservation on Staten Island and to compel the Department of the Interior to accept custody of any portions of the Fort relinquished by the Army. The parties agree that no triable issues of fact are presented and each side has moved for summary judgment.[1] The Court also is of opinion that the controversy between the parties is solely one of law and that summary disposition pursuant to Fed.R.Civ.P. 56 is appropriate. *Mobil Oil Corp. v. Federal Energy Administration,* 566 F.2d 87, 92 (Em.App.1977).

Plaintiffs are organizations and individuals having a commendable interest in the preservation of the environment.[2] Essentially they contend that the military defendants thwarted the plainly expressed intent of Congress that all of Fort Wadsworth, totaling 226 acres,[3] should become part of the Gateway recreation area as soon as the Army relocated or phased out its existing operations there. The violation of legislative intent, they maintain, occurred in 1981 when the Army, after having transferred its last operational activity, granted the Navy a five year permit for the use of three buildings and ten surrounding acres of land in the Fort as NAVRESSO's worldwide headquarters, pursuant to directions of the Department of Defense (DOD).

The principal issue to be decided is whether the Gateway Act was violated, as plaintiffs contend, by reason of that transaction. Since questions of statutory construction are raised, a brief discussion of the purposes of the Act and its expressed limitations is in order at the outset.

At the time of its enactment in 1972, the Gateway Act was viewed by its Congressional sponsors as a new concept for the national park system. Noting that the densely populated New Jersey-New York

---

1. At a preliminary hearing, plaintiffs' motion for a temporary restraining order barring NAVRESSO from moving into the buildings was denied, since before suit was commenced, the Navy had already spent or committed $2.45 million readying them for occupancy.

2. Except for three named employees of NAVRESSO, whose concerns related solely to the inconvenience of traveling to work on Staten Island.

3. It is not clear whether this includes or excludes 26 acres subject to an easement for the Verazzano Bridge granted to New York City's Triborough Bridge and Tunnel Authority.

metropolitan region included many beach-front properties in the New York Harbor vicinity which ought to be preserved for outdoor recreational use, Congress established a "recreation area" in the region. 16 U.S.C. § 460cc. The "area" as depicted on a boundary map was divided into six described "units": (1) Jamaica Bay, (2) Breezy Point, (3) Sandy Hook, (4) Staten Island, (5) Hoffman and Swinburne Islands, and (6) all adjacent submerged lands, islands and waters. *Id.* Within the boundaries of the recreation area, the Secretary of the Interior, who was designated as the administrator, was authorized to acquire lands, waters or interests therein by "donation, purchase or exchange," except that lands owned by New York or New Jersey, or any political subdivisions thereof, could only be acquired by donation. § 460cc–1, 2.

Overall the designated recreation area comprised some 26,172 acres of land, waters, marshes and submerged lands in the New York Harbor area. Of those 26,-172 acres, 22,000 were owned by the States of New York and New Jersey and political subdivisions thereof. Thus the creation of parkland utilizing that acreage depended wholly upon the cooperation of the political entities in control of such property.

In enacting the Gateway Act, Congress was aware that a number of federally-owned properties totaling some 3,737 acres were included within the boundaries of the recreation area, some of which were military installations. One of these was Fort Wadsworth located within the Staten Island unit, which is the focus of this controversy. During the House debate on the bill which, as amended, became the Act, a member of the House Committee on Armed Services strongly objected to a provision which would have immediately turned over military installations located in the Gateway area to the control of the Secretary of the Interior. Reading from the Armed Services committee report, the member noted that the Secretary of Defense had advised that Forts Tilden, Hancock and Wadsworth could not be released to the Interior Department, and that Fort Wadsworth in particular "will not become excess to military requirements within the foreseeable future." The member further pointed out that under House rules the Committee on Armed Services was given the authority to determine whether property under the control of the Defense Department shall be declared excess or not.[4] 118 Cong.Rec. H8754.

To overcome the Armed Services Committee objection, the provision was deleted and replaced by the following limitation regarding federal property located within the area:

> With the concurrence of the agency having custody thereof, any Federal property within the boundaries of the recreation area may be transferred, without consideration, to the administrative jurisdiction of the Secretary [of the Interior] for administration as a part of the recreation area.

§ 460cc–1(b).

Before considering the effect of the foregoing amendment, additional facts must be stated, none of which are in dispute. On June 5, 1979, the Army announced its decision to relocate the Army Chaplain School and close Fort Wadsworth; and in November it issued an interim permit to the National Park Service to occupy and use 81 acres of the Fort. Subsequently, the Army decided to retain 12 acres for an Armed Forces Reserve Center, and thereafter was directed by the Department of Defense to retain 28 additional acres, containing 116 family housing units, which were needed to house married personnel from all Services assigned to the New York area within commuting distance.

The latter directive prompted the Department of Interior to notify the Secretary of Defense on June 24, 1980, that

> the National Park Service is not in position to assume jurisdiction of any addi-

---

**4.** The Senate Committee on Armed Services has co-equal jurisdiction and would also have to be consulted. *See* 10 U.S.C. § 2662.

tional lands at Ft. Wadsworth under these circumstances. It is our view that under these conditions the Army should retain all of the post in appropriate care and custody until such time as the entire site is available for transfer, as contemplated by the legislation and all earlier discussions.

NAR Tab 2.[5] The Army nevertheless filed the necessary report with the Senate and House Armed Services Committees, pursuant to 10 U.S.C. § 2662, stating its intention to dispose of the Fort as excess except for the housing units and the Reserve Center.[6]

In the fall of 1980 a new military contender for space at Fort Wadsworth appeared on the scene. In early September 1980 the Department of the Navy had begun a search for new office space for NAVRESSO, which was then housed in an old federally-owned warehouse facility in the Bush Terminal area of Brooklyn. NAVRESSO is the headquarters for the Navy Resale System, which is comprised of the Navy Exchanges (PX's), Commissary Stores (grocery stores), Ships Stores, Enlisted Dining Facilities (ashore and at sea), and Uniform Stores for the entire Navy. Its basic operations are policy formulation, merchandise selection, store planning and management, general management, and data processing. NAVRESSO employs some 800 civilian workers and 17 military personnel for those purposes and performs no manufacturing, production or warehousing operations. Its need for relocation arose from the deteriorated condition of the building it was then occupying, which was scheduled for demolition in 1984.

After viewing several proposed locations in Queens, Manhattan, and Staten Island, including Fort Wadsworth, Navy officials recommended that a group of three "admin" buildings in the Fort—formerly the Army Chaplain School—best suited NAVRESSO's needs. On November 28, 1980, the Deputy Secretary of Defense preliminarily approved the Navy's request that those buildings and 10 acres of land on which they were situated be turned over for occupancy by NAVRESSO. The Army was also instructed to amend its disposal report "currently awaiting Congressional clearance" to remove that portion of Fort Wadsworth from the "excess" category. NAR Tab 18.

In accordance with Department of Defense and Navy procedure, a fact and justification form and preliminary environmental assessment were completed in December 1980. On December 23, 1980, an EIS Review Panel concluded that the relocation did not require submission of a draft environmental impact statement to the Environmental Protection Agency, since land use would remain the same as originally approved. NAR Tabs 22, 26, 27. On January 13, 1981, the Deputy Secretary of Defense gave final approval to the relocation. NAR Tab 30. Notice of that decision was published in the Federal Register on January 22, 1981, for a 30-day public comment period. On March 13, 1981, after receiving the Army's permit,[7] the Navy announced its intention to commence relocation of NAVRESSO to the Fort Wadsworth site. This action was commenced on June 15, 1981.

## DISCUSSION

■ Although the parties have not addressed the question of standing in their briefs, the Court is satisfied that some of the plaintiffs, as asserted users or potential users of Gateway Recreation Area, have standing to maintain this action on one or more of their claims as hereinafter indicated. *United States v. Students Chal. Reg. Agcy. Pro. (SCRAP)*, 412 U.S. 669,

---

**5.** References "NAR Tab" are to portions of the Navy Administrative Record.

**6.** Compliance with 10 U.S.C. § 2662 required the Army to withhold action on the excessing report for 30 days before proceeding with any "transfer of real property to another Federal agency or another military department" or making a "report of excess real property . . . to a disposal agency." § 2662(a)(4) and (5).

**7.** The permit is revocable at will by the Secretary of the Army.

687–90, 93 S.Ct. 2405, 2415–17, 37 L.Ed.2d 254 (1973). Plaintiffs Simmons and Verdell, however, base their claims solely upon commuting difficulties and therefore do not meet the standing requirement. Their claims are accordingly dismissed.

Plaintiffs' first and principal claim is that the Army's transfer of a ten-acre plot and buildings in Fort Wadsworth "for use as a civilian office complex" by NAVRESSO violates the Gateway Act because it precludes the Interior Department "from obtaining custody of land given to it by Congress for Recreation Area purposes." While recognizing that the Army must concur in any transfer of lands in its custody, plaintiffs argue that the Act "makes such concurrence mandatory by prescribing that the Fort shall be part of the park."

Read literally, the Act plainly provides that Fort Wadsworth is one of the "lands" which "shall comprise" the recreation area. 16 U.S.C. § 460cc(a)(4). Contrary to plaintiffs' assertion, however, there is no express language mandating concurrence in a turnover of any portion of the Fort at any specific time to the Department of Interior. Indeed, the Act's provision for a transfer of any federal property to Gateway is phrased in what appear to the Court to be entirely discretionary terms. § 460cc–1(b). Thus, as in *United States v. Perdue Farms, Inc.,* 680 F.2d 277, 280 (2d Cir.1982), the Court "may look to the legislative history of the enactment to determine whether literal application of the statute would 'pervert its manifest purpose,'" quoting *In re Adamo,* 619 F.2d 216, 222 (2d Cir.), *cert. denied,* 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980).

█ The legislative history of the Gateway Act makes it clear that Congress' purpose was to have as much federal land as possible brought promptly into the Gateway area to serve the public's outdoor recreation needs. See Conference Report No. 1589, 92d Cong., 2d Sess. 1–2, *reprinted in*

U.S.Code Cong. & Ad.News 4882, 4912–13 (1972). However, in the case of military lands, only those "which are *excess* to the needs of the Department of Defense will be transferred as soon as possible to the Secretary of the Interior ...." *Id.* (emphasis supplied). Thus Congress recognized that there were military needs paramount to those of Gateway. Indeed, as noted earlier, the House Armed Services Committee amendment, which is now § 460cc–1(b) of the Act, was enacted to prevent the transfer of military lands to the Department of Interior without the concurrence of the military departments which had need for them. Plaintiffs' contention that the Army "must concur" in a transfer of the entire Fort property to Gateway is therefore not supportable.

Plaintiffs are on more solid ground, however, with respect to the Secretary of the Interior's refusal to take over those portions of Fort Wadsworth which the Department of Defense no longer needs. Except *for an* easement underlying the Verazzano Bridge, note 3, *supra,* the Fort's area comprises 226 acres, which include fortifications of great historical interest. See Report of House Committee on Interior and Insular Affairs No. 1392, 92d Cong., 2d Sess. 8, *reprinted in* U.S.Code Cong. & Ad.News 4882, 4887 (1972). The Army presently occupies a total of 40 acres for its Armed Forces Reserve Center and military housing. Excluding also the 10 acres occupied by NAVRESSO, there remain approximately 176 acres which were stated to be in excess of Department of Defense needs,[8] and which presumably could be available to the public for recreational and historical purposes. Yet the Secretary of Interior has refused to take custody of those portions of the Fort and has returned 81 acres previously held under a permit issued by the Army.

█ In light of the legislative history of the Gateway Act, the position of the De-

---

**8.** As reported in an Army Disposal Report submitted August 30, 1980, to the Chairman of the House Committee on Armed Services, and later amended as of January 30, 1981, to include the 10 acres desired by the Navy for NAVRESSO's

use. See NAR Tab 15 and letter dated February 20, 1981, withdrawing the report, attached to United States Attorney's letter to the Court dated October 29, 1982.

partment of Interior is untenable. If, as appears to be the case, there is acreage in Fort Wadsworth which the Department of Defense no longer needs, it must

be transferred as soon as possible to the Secretary of the Interior notwithstanding the Surplus Property Act or any other provisions of law so that these important lands can help serve the public outdoor recreation needs.

Conference Report No. 1589, 92d Cong., 2d Sess. 2, *reprinted in* U.S.Code Cong. & Ad. News 4882, 4913 (1972). The quoted language illumines the meaning of § 460cc–1(b): although an agency having custody need not surrender necessary Federal property located within Gateway, the Secretary of Interior is not given discretion to refuse it when it becomes available. Nowhere in the Act is there any language which relieves the Secretary of his statutory obligation to take possession of Federal land within Gateway's boundaries which has become available. While "minor revisions" in those boundaries may be made "when necessary," § 460cc(b), the mandate is clear that the Secretary "shall inventory and evaluate all sites and structures having present and potential historical, cultural, or architectural significance," in addition to providing "for appropriate programs for the preservation, restoration, interpretation, and utilization of them." § 460cc–2(g).

█ It would appear that none of those responsibilities has been fulfilled by the Secretary and that the intent of Congress expressed in the Gateway Act has been frustrated. That the Department of Defense has need for a relatively small portion of the Fort is not a valid reason for rejecting 176 acres that are available, especially when they contain historical fortifications which Congress has recognized as major attractions in the area. See House Report No. 1392, 92d Cong., 2d Sess. 6, *reprinted in* U.S.Code Cong. & Ad.News 4882, 4887 (1972). In the circumstances, plaintiffs are entitled to an order directing the Secretary of the Interior to take such appropriate action as may be necessary to obtain custody of the excess land available at Fort Wadsworth on or before September 16,

1983, and to comply thereafter with the administrative duties imposed upon him by the Gateway Act.

█ Returning to plaintiffs' claim challenging the legality and propriety of the Army's transfer of 10 acres in Fort Wadsworth to the Navy for the use of NAVRESSO, the cases are legion that a court should tread carefully in an area where essentially professional military judgments are involved. The Supreme Court has repeatedly pointed out that

judges are not given the task of running the [Armed Services] .... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate [Armed Services] matters as the [Armed Services] must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). *See also Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973); *Schlesinger v. Ballard,* 419 U.S. 498, 510, 95 S.Ct. 572, 578, 42 L.Ed.2d 610 (1975). Precisely such a military judgment is sought to be questioned by plaintiffs here.

In 1958, Congress amended the National Security Act of 1947 to bring the Departments of the Army, Navy and Air Force "under the direction, authority, and control of the Secretary of Defense ...." 50 U.S.C. § 401. Even though each of the three military departments remained separately organized under its own Secretary, they were to "function under the direction, authority and control of the Secretary of Defense ...." *Id.* Thus it was entirely within the authority of the Secretary of Defense to approve the Navy's request to provide available space at Fort Wadsworth for the use of NAVRESSO, and to direct the Army to amend its disposal report to exclude that space from those portions of the Fort which the Army had previously declared to be excess, but which had not been acted upon by the Congressional Arm-

ed Services Committees. And, finally, pursuant to the Code of Regulations pertaining to the national defense, it is incumbent upon the Armed Forces that they "[a]ssist each other in the accomplishment of their respective functions, including *the provision of . . . facilities, equipment, supplies and services.*" 32 C.F.R. § 368.5(b)(11) (1982) (emphasis supplied).

Obviously, the former Army Chaplain school buildings now occupied by NAVRESSO were "facilities" which the Army had an obligation to provide to the Navy when they became available, pursuant to § 368.5 *supra.* Plaintiffs, moreover, concede—despite their emphasis on the number of its civilian employees—that NAVRESSO's functions "have military and defense importance." Pl. Reply Memo. at 38. Yet they insist that those functions could just as well have been carried on elsewhere. Perhaps that is so, but the judgment as to the need involved is not committed to the Court or to the plaintiffs. Rather, "[t]he complex, subtle, and professional decisions as to the . . . equipping . . . of a military force are essentially professional military judgments, subject *always* to civilian control of the legislative and executive branches." *Gilligan v. Morgan, supra,* 413 U.S. at 10, 93 S.Ct. at 2446 (emphasis in original).

The principle of nonjusticiability cannot be by-passed by plaintiffs' generalized assertions that there was "never a national defense justification," or that the military decision was improperly based upon "economic" justifications or the desire for a "near country club setting" at Fort Wadsworth. The lower courts have consistently rejected attempts to involve them in review of military decisions regarding use or disposal of land or facilities. *See National Association of Government Employees, Inc. v. Schlesinger,* 397 F.Supp. 894 (E.D.Pa. 1975) (closure of arsenal for economic reasons); *City and County of San Francisco v. United States,* 443 F.Supp. 1116 (N.D.Cal. 1977), *aff'd,* 615 F.2d 498 (9th Cir.1980)

(Navy lease of non-excess shipyard to private corporation for economic reasons); *United States v. 45,149.58 Acres of Land, Etc.,* 455 F.Supp. 192 (E.D.N.C.1978) (no judicial review of Secretary of Defense condemnation of private land for practice bombing range).

Plaintiffs' final attempt to upset the NAVRESSO relocation invokes the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"). Their first argument that the military defendants violated NEPA is premised on the novel contention that those defendants ignored "the impact of Fort Wadsworth's removal from the Gateway National Recreation Area." Pl. Memo. at 46. The "removal" they refer to, however, was not action on the part of those defendants but rather the voluntary decision of the Secretary of Interior not to comply with the mandate of the Gateway Act that he take prompt custody of the remainder of Fort Wadsworth which was excess to the needs of the military.

Plaintiffs' next argument on the NEPA issue is somewhat inconsistent with their position that no triable issues of fact bar summary judgment in their favor. In that argument they challenge the military's good faith by asserting that the Army and Navy had "privately" agreed to "the transfer of Fort Wadsworth prior to any undertaking of the environmental review process."[9] Pl. Memo. at 28, 50. The correspondence between the Deputy Secretary of Defense and then Secretary of Interior Andrus, as well as other documentation in the NAR, do not support the sinister cast placed upon a normal interchange among government officials. The undisputed facts are that the Navy did prepare a comprehensive environmental assessment which was submitted to the Chief of Naval Operations on December 22, 1980, NAR Tab 26, on the basis of which an EIS Review Panel concluded that no draft environmental impact statement (EIS) need be submitted to the Environmental Protection Agency.[10] Obvi-

---

**9.** Throughout their papers and briefs plaintiffs constantly refer to "Fort Wadsworth" when

what is involved here is only a 10-acre plot and three buildings thereon.

**10.** As previously noted, the Deputy Secretary

ously, this imported a judgment that the impact on the environment was not significant, even if the relocation could be considered "major" in terms of the cost of renovating the three buildings involved.

■ In making the determination as to whether an EIS must be prepared, the Council on Environmental Quality has pointed out:

> The identification of major actions significantly affecting the environment is the responsibility of each federal agency, to be carried out against the background of its own particular operations.... The words "major" and "significantly" are intended to imply thresholds of importance and impact that must be met before a statement is required.

40 C.F.R. § 1500.6(c). In applying these guidelines and interpreting Section 102(C), 42 U.S.C. § 4332(C), this Circuit has held that the concepts of "major federal action" and "significant effect" are separate and distinct and that the Federal agency is authorized to make the threshold determination as to each component when deciding whether an EIS is necessary. *Hanly v. Mitchell*, 460 F.2d 640, 644 (2d Cir.), *cert. denied sub nom., Hanly v. Kleindienst*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) ("Hanly I"). And in making this threshold determination, the agency need not place the same weight on the factors as would the plaintiffs. *Id.* at 648. Finally, as the Court subsequently pointed out in the *Hanly* litigation, the appropriate standard for the agency to apply in determining whether a proposed action is a major federal action is

> to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to

existing adverse conditions or uses in the affected area.

*Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir.1972) (Hanly II).

■ The Navy's determination in this case can hardly be said to be arbitrary and capricious. The relocation of NAVRESSO consisted only of moving office workers from a building in Brooklyn scheduled for demolition to existing office-type facilities in Fort Wadsworth. No new buildings were to be built. As the Navy's preliminary environmental assessment pointed out:

> Planning initiatives for the surrounding area consist of the establishment of a park to be utilized by the general public. The proposed relocation will not interfere with these plans as no new construction or expansion of facilities is anticipated. Interior alteration of facilities will not degrade the proposed park but in fact will enhance the overall appearance.

NAR Tab 19, page 3. The question as to whether the relocation would rule out the use of Fort Wadsworth as a park was specifically considered and answered as follows:

> No. DOD [Department of Defense] intends to retain 116 units of military housing and an Armed Forces Reserve Training Center on Fort Wadsworth as well as 3 buildings for NAVRESSO. All of these buildings are adjacent to one another and could be easily severed from the total area without impairing the use of the area as a park or access to the park.

NAR Tab 19 Questions and Answers, page 2.

Plaintiffs' final contention that the relocation of 800 civilian workers and 17 military personnel to Fort Wadsworth would occasion potential traffic, social and economic impacts on Staten Island, which presumably would affect the environment, is also lacking in merit. A map of the area in which the NAVRESSO buildings are located discloses that the site is situated next to the Verazzano Bridge. Assuming all 817

---

of Defense did not give his final approval to the NAVRESSO relocation until January 13, 1981.

NAR Tab 30.

NAVRESSO personnel each were to use a vehicle to get to and from work, that would be a drop in the bucket compared to the daily volume of vehicular traffic using the Bridge. Insofar as social and economic considerations are involved, it appears that Staten Island residents were strongly in favor of the relocation, with only plaintiff Benbow in dissent. NAR Tab 74.

Accordingly, consistent with the rulings made herein, plaintiffs are entitled to summary judgment on their Eighth Claim for Relief only to the extent of directing the Secretary of the Interior to take appropriate action to obtain custody of all excess land available at Fort Wadsworth on or before September 16, 1983, pursuant to the terms of the Gateway National Recreation Act. Summary judgment in favor of defendants dismissing all other claims of plaintiffs is also granted. The parties will submit proposed forms of judgment no later than July 29, 1983.

SO ORDERED.