**Rosa Redding BLOODWORTH and Frank Rhodes, on behalf of themselves and all others similarly situated**

v.

**OXFORD VILLAGE TOWNHOUSES, INC., et al.**

**Civ. A. No. 74–316.**

United States District Court,
N. D. Georgia,
Atlanta Division.

June 28, 1974.

Antonio L. Thomas, Richard D. Ellenberg, Atlanta Legal Aid Society, Atlanta, Ga., for petitioners.

John W. Stokes, Jr., U. S. Atty., Lawrence J. McEvoy, Jr., Atlanta, Ga., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is a class action brought by two members of a cooperative housing project organized under the aegis of Section 236 of the Housing and Urban Development Act of 1968. (12 U.S.C. § 1715z–1). Named as defendants are various private organizations and federal officials, namely, Oxford Village Townhouses, Inc. (hereinafter, "Oxford"), the cooperative; FCH Services, Inc. (hereinafter, "FCH"), manager of the project; the Foundation for Cooperative Housing, parent of FCH; James T. Lynn, Secretary of the Department of Housing

and Urban Development; W. A. Hardman, Acting Area Director of HUD; and finally, HUD itself. Plaintiffs contend that the private defendants, with the approval and authorization of the federal defendants have undertaken certain actions violative of rights secured to plaintiffs by virtue of Section 236 and the Fifth Amendment to the U. S. Constitution. As will be discussed more fully below, the jurisdiction of this court to hear the subject matter of this action is an issue hotly contested by the parties. Declaratory and injunctive relief, as well as money damages, has been requested.

The action is presently before the court on plaintiffs' request for preliminary injunctive relief, a motion to dismiss for lack of subject matter jurisdiction brought by the defendants Oxford and FCH, and a motion by the Atlanta Legal Aid Society to appear as *amicus curiae*. The motion to appear as *amicus curiae* is hereby GRANTED. After careful consideration, the court has concluded that plaintiffs are entitled to some preliminary relief pending the final adjudication of this action.

### A. *Background.*

Before proceeding to the merits of today's motions, it may be helpful to briefly outline the legal nature of a Section 236 cooperative housing project. Section 236 was added to the National Housing Act (12 U.S.C. §§ 1701 et seq) in 1968 to encourage private enterprise to develop, construct, and operate decent housing for poor families. Private sponsors of such housing projects (which may be cooperatively organized, as in the present case), are encouraged to do so by the availability under Section 236 of federal mortgage insurance, interest subsidies, and tax benefits. See, Note, Procedural Due Process in Government Subsidized Housing, 86 Harv.L.Rev. 880, 882–897 (1973). In return for these benefits, the federal government, acting through HUD, demands an active role from the initial development through the continuing oper-

ation of the project. HUD sets requirements as to who may develop the project; establishes standards for its construction and location; establishes cost and credit controls; and inspects the development of the project. After the project is constructed, HUD's participation continues through subsidization and supervision of the project's operation. See, 24 CFR § 236, Subparts A and B, and 24 CFR § 221, Subsection C. As in the present case, HUD normally enters into a Regulatory Agreement with the mortgagor which sets out in detail those conditions which the mortgagor must fulfill in order to maintain federal assistance throughout the life of the mortgage.

### B. *The Complaint.*

With this background in mind, we may now turn to an analysis of the instant complaint. Plaintiffs allege that Oxford, the mortgagor, is a nonprofit Georgia corporation formed in February of 1971 to provide housing to low and moderate-income families, on a cooperative basis, pursuant to Section 236. Shortly thereafter, Oxford obtained a contract of mortgage insurance from the Federal Housing Commissioner (a HUD official), and entered into a Regulatory Agreement with HUD. Oxford in turn contracted with FCH to manage the project. Plaintiffs entered into subscription agreements with Oxford which set forth the terms and conditions of their membership in Oxford, as well as occupancy agreements which set forth the terms and conditions of their occupancy. Plaintiffs allege that pursuant to the occupancy agreements, Oxford and FCH agreed to purchase utilities, including electricity, for the project and apportion the cost thereof through monthly carrying charges assessed against each member.

Plaintiffs' complaint is in four counts. Count One alleges that on December 26, 1973, Oxford and FCH notified members of the plaintiff class by letter that they would no longer provide electrical utility service, notwithstanding those provi-

sions in the occupancy agreements to the contrary. The result of such action, according to plaintiffs, is that each member has been forced to independently contract with the Georgia Power Company for electricity. Although the complaint itself is rather ambiguous on this point, counsel for plaintiffs indicated at the May 3 hearing that it is also plaintiffs' position that at the same time Oxford and FCH notified project members that their monthly carrying charges would no longer cover the cost of electricity, plaintiffs were also notified that the carrying charges would be increased. It is further alleged that these actions were taken with the express prior approval and authorization of HUD. As will be discussed more fully below, plaintiffs appear to contend that the discontinuance of electrical utility services, combined with an additional carrying charge increase, violates their Fifth Amendment rights to due process because defendants failed to provide prior notice, an opportunity to be heard, and a list of reasons for the increase.

Count Two of the complaint alleges that Oxford and FCH have failed to maintain the project at a level of repair as required by state and federal law, as well as by the Regulatory Agreement entered into between HUD and Oxford. Count Three alleges that such improper maintenance and repair, when combined with the discontinuance of electrical utility service, amounts to a constructive eviction of plaintiffs in violation of their Fifth Amendment rights.

Count Four alleges that the Board of Directors of Oxford is improperly constituted, and that as a result thereof, every action taken by the Board is null and void. Specifically, plaintiffs allege that pursuant to the bylaws of Oxford Village Townhouses, Inc., the project would be governed by a Board of Directors composed of five members, all of whom (except the first Board of Directors) should be elected by project members and a majority of whom should be project members. Plaintiffs contend that none of the present Board members are project members and that none of the present Board members were elected by project members.

In its prayer for relief, the complaint requests an order from this court declaring illegal, as violative of the private defendants' statutory, contractual and constitutional duties: Oxford's and FCH's failure to provide electrical utility services and maintain the project at an acceptable level of repair; Oxford's and FCH's increase of the carrying charges without affording plaintiffs any due process protections; the constructive eviction of plaintiffs as a result of the above; and finally, the present composition of the Board of Directors of Oxford. Plaintiffs also request an order declaring that the federal defendants have a responsibility to require the private defendants to perform their various duties. No specific preliminary or permanent injunctive relief is requested, with the exception of a request for a temporary restraining order preventing the private defendants from discontinuing providing electrical utility services, which was denied shortly after this action was filed. It should be noted, however, that plaintiffs have requested "such other, further and additional relief as may be just and proper." Finally, plaintiffs request actual damages in the amount of $50,000, damages for mental suffering in the amount of $10,000, and punitive damages in the amount of $25,000.

## C. *Subject Matter Jurisdiction.*

The complaint asserts that the court has jurisdiction over the subject matter of this action because it seeks to compel federal officials to perform their duties, pursuant to 28 U.S.C. § 1361, and because it raises a federal question, pursuant to 28 U.S.C. § 1331. Defendants Oxford and FCH have moved to dismiss the action as against them because they are not federal officials within the meaning of § 1361, and because plaintiffs have failed to satisfy the jurisdictional amount requirement of § 1331. The federal defendants agree with the

above, and also argue that mandamus jurisdiction is absent because they owe no duties to plaintiffs. For the reasons below, we cannot agree that the action should be dismissed for lack of subject matter jurisdiction.

■ First, we are unpersuaded that plaintiffs have failed to satisfy the $10,000 jurisdictional amount requirement of § 1331(a). It is well settled that dismissal for failure to satisfy the jurisdictional amount is justified only where it appears to a legal certainty that the amount is less than $10,000. See, Wright, Federal Courts (2d ed.), § 33, p. 112. In the present case, the jurisdictional amount is satisfied if the court considers the economic harm to plaintiffs over a period of time. In Anderson v. Denny, 365 F.Supp. 1254, 1259 (W.D.Va.1973), the court considered whether tenants evicted from a Section 236 housing project satisfied the jurisdictional amount requirement of § 1331, and found as follows:

> The requirement that the amount in controversy exceed the sum of $10,000 is . . . met in this case. Mrs. Long, her husband and two children pay a monthly rental of only $99.00 for their apartment at Oak Ridge Gardens. There is obviously a certain value at stake in this lease which would be lost if plaintiff were evicted. The amount of such loss would exceed $10,000 over the life of Mrs. Long, who is presently only 21 years of age.

Similarly, in Joy v. Daniels, 479 F.2d 1236, 1239 n. 6 (4th Cir. 1973), the Fourth Circuit Court of Appeals indicated that a low-income tenant evicted from a federally subsidized housing project could consider the "bargain" value of her lease for the rest of her life in computing the amount in controversy, pursuant to § 1331.

■ Although an actual eviction is not alleged in the present case, it is alleged that defendants' failure to maintain the project at an adequate level of repair, combined with the discontinuance of electrical utility service amounts to a constructive eviction. In light of the fact that plaintiffs are low income tenants, we do not feel that their failure to leave the project necessarily undercuts any argument of constructive eviction, as their ability to go out into the market to purchase other housing is presumptively low. Further, plaintiff Bloodworth testified at the May 3 hearing that her monthly carrying charges have increased $12 a month (notwithstanding the fact that such charges no longer cover electrical utilities), and that her utility bills would be increased $55 a month, for a total effective increase of $67. In 12½ years, Ms. Bloodworth would pay out the jurisdictional amount of $10,000 in increased costs. It may very well be that after all the proof is in, the amount in controversy for each individual plaintiff will be less than $10,000, but the court cannot say at the present time that such amount is, to a legal certainty, less than $10,000. As plaintiffs assert rights allegedly secured to them by the National Housing Act, there can be no question that this action "arises under the Constitution, laws, or treaties of the United States", as required by § 1331(a). Therefore, the court finds that subject matter jurisdiction may be asserted by virtue of the existence of a federal question.

■■ Second, it is clear to this court that subject matter jurisdiction may be asserted with respect to the federal defendants by way of mandamus, pursuant to § 1361. See, Hahn v. Gottlieb, 430 F.2d 1243, 1245 n. 1 (1st Cir. 1970). As mandamus jurisdiction properly exists as to the federal defendants, then pendent jurisdiction exists as to the private defendants (see, United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ), who may be joined to the action as indispensible parties, pursuant to Rule 19(a), Fed.R. Civ.P. (see, Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2d Cir. 1971) ).

■ Finally, *amicus* has raised the argument that subject matter jurisdiction may be asserted through 28 U.S.C.

§ 1337, on the grounds that this action arises under an act of Congress regulating commerce. This approach was taken by the Third Circuit Court of Appeals in Davis v. Romney, 490 F.2d 1360 (3rd Cir. 1974), an action in which plaintiffs asserted rights secured by Sections 221(d)(2) and 235 of the National Housing Act (12 U.S.C. § 1715*l*(d)(2) and § 1715z). The Court stated as follows:

> The commerce power clearly is a significant source of federal power for the National Housing Act, which was largely designed to stimulate the building trades and increase employment . . . and to control various aspects of interstate commerce connected with mortgage financing.

490 F.2d at 1365–1366. The Court drew on several sources to reach this conclusion, including the recognition by the U. S. Supreme Court in United States v. Emory, 314 U.S. 423, 430, 62 S.Ct. 317, 321, 86 L.Ed. 315 (1941), that "[t]he plain objective of the Housing Act was to stimulate the building trades and to increase employment." It should be noted that the Ninth Circuit Court of Appeals has reached a result contrary to the Third Circuit's conclusion in Potrero Hill Community Action Committee v. Housing Authority of the City & County of San Francisco, 410 F.2d 974, 979 (9th Cir. 1969). However, the *Potrero* court gave no reasoning for its result, and we therefore decline to follow that case. Although counsel for plaintiffs have not asserted § 1337 as a grounds for subject matter jurisdiction, we are convinced that it is available if jurisdiction is wrongly grounded upon § 1331 and § 1361. See also, Mandina v. Lynn, 357 F.Supp. 269, 276 (W.D.Mo. 1973).

### D. *Preliminary Relief.*

The purpose of preliminary injunctive relief is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 441 F.2d 560, 561 (5th Cir. 1971). See also, Johnson v. Radford, 449 F.2d 115, 117 (5th Cir. 1971); J. Moore, Federal Practice, ¶ 65.04[1] (1974). Four factors should be considered in determining whether or not preliminary injunctive relief is appropriate: (1) whether the plaintiff is likely to prevail on the merits; (2) whether the plaintiff is in danger of suffering irreparable harm; (3) whether the potential harm to the defendant(s) from the issuance of the injunction outweighs the possible harm to the plaintiff if injunctive relief is denied; and (4) whether issuance of a preliminary injunction will serve the public interest. Di Giorgio v. Causey, 488 F.2d 527 (5th Cir. 1973); Blackshear Residents Organization v. Romney, 472 F.2d 1197 (5th Cir. 1973). See also, American Radio Ass'n v. Mobile S. S. Ass'n., 483 F.2d 1 (5th Cir. 1973).

Consideration of what preliminary relief, if any, should be ordered pending final adjudication of this action has been hampered somewhat by the complaint's failure to specify with sufficient precision what injunctive relief will be necessary to secure plaintiffs the rights asserted herein. Nevertheless, it appears that plaintiffs request the following: (1) an order compelling defendants to give plaintiffs certain due process protections before collecting increased monthly carrying charges; (2) an order restraining defendants from constructively evicting plaintiffs; and (3) an order restraining Oxford's Board of Directors from engaging in any official business until it is properly constituted. We will consider each type of injunctive relief separately.

(1) *Compelling defendants to give plaintiffs due process protections before collecting increased carrying charges.*

The court will first consider whether there is a likelihood that plaintiffs will prevail on the merits of their claim that carrying charges may be increased only after notice, an opportunity to be heard,

and the furnishing of a list of reasons for the increase. We feel that the likelihood is substantial.

Plaintiffs contend that Section 236 confers upon them a concrete interest in low housing costs sufficient to invoke the protections of the due process clause of the Fifth Amendment. This argument is bottomed upon Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and its progeny; Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), among others. These cases make it clear that where an unconstitutional deprivation of a government benefit is alleged, there must be a three-part inquiry to determine: (1) whether the programs involve sufficient government action to invoke federal constitutional protections; (2) whether the private interest involved is a "property" or "liberty" interest within the meaning of the due process clause; and (3) after balancing the various interests involved, what procedure is appropriate for the protection of the private interest.

It is clear to this court that there is sufficient federal action to invoke the protection of the Fifth Amendment. As discussed above, the involvement of HUD in a Section 236 project is quite extensive, both at the development and construction stages, as well as during the ongoing operation of the project. This involvement places the private mortgagor in the role of an intermediary carrying out the governmental function of providing decent housing to poor families. HUD's supervision and control, moreover, extends to virtually every phase of a Section 236 project's operation, including the approval of all rental or carrying charge increases. See, 24 CFR 236.55 and § 4 of the Regulatory Agreement allegedly entered into between Oxford and HUD, attached to plaintiffs' complaint. Therefore, the majority of those courts which have considered the question of federal involvement in Section 221(d)(3) (12 U.S.C. § 1715l(d)(3)) projects (essentially similar to Section 236 projects except that the government subsidies are larger) have concluded that there is sufficient federal involvement. See: Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970); McKinney v. Washington, 143 U.S.App.D.C. 4, 442 F.2d 726 (1970); Keller v. Kate Maremount Foundation, 365 F.Supp. 798 (N.D.Cal.1972); but contra, Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971).

The next step in this analysis is to determine whether or not the members' interest in not having their carrying charges increased is a constitutionally protected property interest. We feel that it is. Roth and Sindermann, both supra, stand for the proposition that a recipient's expectation or need of government benefits may be deserving of due process protection if, and only if, such need or expectation is objectively justifiable. In Roth, the Court explained this principle as follows:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than an unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577. In that case, the Court held that Roth's expectation that his contract as a professor with a university would be renewed was not deserving of due process protection because it had no basis in contract, statute, or past university practice. The opposite result was achieved in *Sindermann*, however, where the Court felt that a series of yearly renewals of a professor's contract might have provided a sufficiently firm basis in which the professor could ground a reasonable expectation, worthy of due process protection, that his contract would be renewed.

In the present case, plaintiffs would appear to have an objectively justified expectation, grounded firmly in Section 236, that they will continue to receive the benefits of low-cost housing. If low-cost housing is not a major purpose of Section 236, then the existence of federal subsidies and supervision of the project, including prior HUD approval of all carrying charge increases, makes no sense whatsoever. Therefore we conclude that a property interest deserving of due process protection exists in this action.

■■■ The final, and perhaps most difficult, step in this analysis is to determine what due process protections most appropriately protect plaintiffs' interest. Courts making such a determination typically use a three-part test, which requires them to weigh: (1) the importance of the interests threatened; (2) the appropriateness of the requested procedure in protecting those interests; against (3) the costs of the procedure. See, e. g., Morrissey v. Brewery, 408 U. S. 471, 481–490, 92 S.Ct. 2593, 33 L.Ed. 2d 484 (1972); Bell v. Burson, 402 U.S. 535, 539–542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Richardson v. Perales, 402 U.S. 389, 401–407, 91 S.Ct. 1420, 28 L. Ed.2d 842 (1971); and Goldberg v. Kelly, 397 U.S. 254, 263–271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). See also, Note, Procedural Due Process in Government-Subsidized Housing, *supra*, at 891. In their complaint, plaintiffs request due process protections in the form of prior notice, an opportunity to be heard, and a list of reasons for the increase. We see no compelling reason why such protections could not be afforded in the present case.

Although plaintiffs are not being threatened with absolute termination of their membership and occupancy in Oxford, it cannot be said that the magnitude of their interest in continuously receiving the benefits of low-cost housing is small. As members of Oxford are presumably of limited means, even a small increase might be more than many of them could afford, and would force such members to leave the project. Such a result would be tantamount to an eviction and the total termination of the benefit. The amount of the present increase is not small. Plaintiff Bloodworth, who had previously been paying a monthly carrying charge of $114, which amount covered the cost of electricity, is now paying a monthly carrying charge of $126, which amount no longer covers the cost of electricity. The effective increase is therefore a combination of the $12 increase of her monthly carrying charges, plus the cost of obtaining electricity from the Georgia Power Company. From the testimony at the May 3 hearing, it appears that as a result of the fact that the building units are poorly insulated and are electrically heated, Ms. Bloodworth's monthly electric bill may run as high as $55. Thus the total effective increase may be as high as $67 per month, representing a fifty-percent or greater increase over her previous housing costs.

Having found the magnitude of plaintiffs' interest to be significant, we will now consider whether the requested procedure—prior notice, an opportunity to be heard, and a list of reasons for the increase—will adequately protect that interest. It is clear to this court that member input at the pre-increase stage would be of some value in this case, especially where plaintiffs allege that no members of Oxford currently sit on its Board of Directors. If, for example, Oxford decided that the project's electric

utility costs were too high, other alternatives, besides switching the costs directly upon the members, could be considered. One such alternative might consist of attempts to improve the units' insulation. Member input could provide valuable information as to the adequacy of such insulation. To choose another example, Oxford could have decided that the increased costs of operating the project, including higher fees to FCH, the project manager, justified a separate increase in the carrying charges. Member input could similarly provide valuable information as to whether FCH was managing the project efficiently. Of course, the project members may not be able to shed any light whatsoever on certain other economic factors unrelated to the daily operation of the project (See, Hahn v. Bottlieb, *supra*, at 1248), but this does not mean that their comments are worthless. In any event, the members presently have no real way of knowing why their carrying costs were increased, absent a judicial action of this type. The appearance of arbitrary action, perhaps even more than the fact thereof, may contribute significantly to a lessening of cooperation by project members which would certainly make the effective management of the project more difficult and hence frustrate the purpose of Section 236. In light of the above, we conclude that prior notice, an opportunity to be heard, and a list of reasons for the increase, will adequately protect the members' interest.

Our final task in determining the type of procedural protection required is to weigh the above factors—that is, the magnitude of the interest and the appropriateness of the procedure in protecting the interest—against the cost of the procedure, both to the government and to the private developer or manager. The burden of providing members with prior notice and a list of reasons for the increase is clearly negligible. The only real problem is the opportunity to be heard. In Hahn v. Gottlieb, *supra*, the First Circuit Court of Appeals denied the plaintiff tenants' request for a full

adversarial hearing, including the right to cross-examine adverse witnesses, and to an impartial decision-maker, who must state the reasons for his decision and the evidence on which he relies. 430 F.2d at 1248. We agree with the First Circuit that such an encumbrance upon the carrying charge increase process would so burden the private landlord as to make a Section 236 project an unattractive investment, and therefore defeat the purposes of Section 236. Having said this, however, we do not read Hahn v. Gottlieb as implying that a less formal procedure—such as the opportunity for members to submit to HUD written objections to the proposed increase—would be overly burdensome. This approach has been taken by at least two district courts. See, Geneva Towers Tenants Organization v. Federated Mortgage Investors, No. C–70 104 SAW (N.D.Cal., Jan. 3, 1972), summarized at 2 CCH Pov. L. Rep. 16,402; and Keller v. Kate Maremount Foundation, 365 F. Supp. 798 (N.D.Cal. June 15, 1972). Such an approach would appear to be an adequate compromise between the need to allow some opportunity for member input and the necessity of keeping Section 236 projects attractive to investors. The opportunity to submit written objections would, however, be meaningless unless the members had some advance idea of the reasons for the proposed carrying charge increase. Thus, if written objections are to be allowed, then the notice of the proposed increase must contain a summary of the reasons therefor.

In light of the above, it would appear that prior notice, an opportunity to submit written objections, and a list of reasons for the increase, will adequately protect plaintiffs' interest in receiving the benefits of low-cost housing. Such procedures would be required regardless of whether the increase is accomplished by actually raising the carrying charges, or by discontinuing services previously supplied by the mortgagor without raising the carrying charges. As discussed above, both are alleged in the present

case. Therefore, we must conclude that plaintiffs have a substantial likelihood of prevailing on the merits as to this question.

 Having concluded that plaintiffs will probably prevail on the merits, the court must next determine, for the purposes of awarding preliminary relief, whether plaintiffs are in danger of suffering irreparable harm. Normally, the temporary loss of money, ultimately to be recovered, does not usually constitute irreparable injury. This principle was recently reaffirmed by the Supreme Court in Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), where the Court reversed lower court orders granting the plaintiff, a probationary employee in the federal government, temporary relief enjoining dismissal from employment. The Court noted, however, that certain "extraordinary situations" might arise in which the temporary loss of money could amount to irreparable injury. 94 S.Ct. at 953 n. 68. Although the Court declined to define such an extraordinary situation, we believe that one exists in this action. As discussed above, in connection with the magnitude of plaintiffs' interest, an effective fifty percent increase in a low-income family's housing costs may be tantamount to eviction, or may impose substantial financial hardships on such families, thereby entailing large sacrifices in their standard of living. If plaintiffs were in a more favorable economic position, then the impact of defendants' action would not be as great and the court would be reluctant to find the injury to plaintiffs to be irreparable. Such is not the case here. Accordingly, we find that the irreparable injury test has been satisfied.

The third factor which must be considered to determine if preliminary relief is warranted is whether the potential harm to the defendants from granting preliminary relief outweighs the possible harm to plaintiffs if it is denied. Neither plaintiffs nor defendants have addressed this issue, at least with respect to the carrying charge increase.

The only potential harm to defendants that we can possibly foresee from a preliminary injunction restraining Oxford and FCH from collecting the increase in carrying charges and discontinuing provision of electrical utility service is the real possibility that the overall increase may be objectively justified. Insufficient revenue could force Oxford to default on the mortgage and therefore necessitate a HUD takeover of the project. Granted that such a result is undesirable, we foresee no reason why Oxford and FCH could not collect such increase and discontinue such utilities (if warranted) after the requirements of due process have been met. Further, we also see no reason why these requirements could not be met in a very short period of time. Therefore, we must conclude that the potential harm to the defendants from granting preliminary relief will be minimal.

The fourth and final factor to be considered with respect to preliminary relief is the public interest. Again, neither side has addressed this issue. In this regard, however, it might be noted that the present action has not arisen in the context of a dispute between private individuals, and that the rights asserted by plaintiffs are not grounded in a private contract. Instead, the rights asserted by plaintiffs are grounded in a federal statute, and the function of preliminary injunctive relief would be to insure that the purposes of that statute are not frustrated during the pendency of this action. Therefore, we conclude that the existence of a strong public interest militates in favor of preliminary injunctive relief.

 To summarize, the court has found that with respect to the carrying charge increase issue, (1) plaintiffs are likely to prevail on their merits; (2) plaintiffs are likely to suffer irreparable harm if preliminary relief is denied; (3) the harm to defendants from such relief is not great; and finally (4) preliminary relief is in the public interest. Accordingly, it is hereby ordered that, pending the final adjudication of this

action, defendants Oxford and FCH are hereby enjoined from collecting the monthly carrying charge increase, and discontinuing providing electrical utility services, pursuant to the letter of December 27, 1973. This order shall not be construed, however, as preventing HUD from reconsidering *de novo* the application of Oxford Village Townhouses for carrying charge increases, if such reconsideration is taken in a manner consistent with the constitutional rights of plaintiffs as defined in this order.

(2) *Restraining defendants from constructively evicting plaintiffs.*

As noted in the introduction to this order, the complaint alleges that Oxford and FCH have constructively evicted plaintiffs and their class without due process of law by discontinuing providing electrical utility services and by maintaining the project at a substandard level of repair. The complaint requests a declaratory judgment to that effect, as well as a declaration that the federal defendants have failed to adequately supervise the project. Again, plaintiffs have failed to delineate with sufficient clarity what injunctive relief, if any, will be required to enforce these rights.

Before proceeding to the question of preliminary relief, the court notes that the issue of constructive eviction without due process by termination of electrical utilities has been resolved by our decision to treat such termination as an effective carrying charge increase and hence subject to due process protections. With respect to the due process aspects of defendant's alleged failure to maintain the project at an acceptable level of repair, the court feels that many of plaintiffs' complaints could similarly be raised in written objections to the carrying charge increases, as discussed above. In any event, the court feels that two avenues of injunctive relief are available with respect to defendants' alleged failure to keep the project in good repair: that is, an order compelling Oxford and FCH to properly maintain the project, and an order compelling HUD to take over the operation of the project. After careful consideration, the court has concluded that neither avenue of relief should be taken on a preliminary basis.

Plaintiffs' contention that Oxford has a duty to keep the project in good repair is grounded in 24 CFR § 221.530(b), which states that:

> [t]he mortgagor [that is, Oxford] shall maintain its project, the ground, buildings and equipment appurtenant thereto in good repair and will promptly complete necessary repairs and maintenance as required by the [Federal Housing] Commissioner.

Section 221.530(b) has been made applicable to Section 236 projects by virtue of 24 CFR § 236.1. In addition, Section 7 of the Regulatory Agreement entered into between Oxford and HUD states that "[t]he [m]ortgagor shall maintain its project, the grounds, buildings and equipment appurtenant thereto, in good repair and in such condition as will preserve the health and safety of its occupants." Similarly, Article 10 of the Occupancy Agreements entered into between plaintiffs and Oxford places the obligation for almost all repairs not caused by the member upon the mortgagor. Neither Oxford nor FCH has disputed their obligation to keep the project in good repair.

If it ascertains that a project is not being kept in good repair, HUD has the authority, pursuant to its own regulations, to take over the project and make the needed repairs. First, HUD can request the mortgagee to declare the indebtedness due and payable for a breach of the Regulatory Agreement. In the event of such acceleration and foreclosure, HUD would pay the insurance for the indebtedness to the mortgagee and acquire the property. See, 24 CFR § 207.258(c), made applicable to Section 236 projects by virtue of 24 CFR § 236.-251. Alternatively, the mortgage could be assigned directly to HUD. See, 24 CFR § 207.258(b), also made applicable to Section 236 projects by virtue of 24

pursuant to the mortgage, HUD could then take over the operation of the project, either by appointing a receiver or CFR § 236.251. *Amicus* contends that by entering the property itself. Unfortunately, a copy of the mortgage agreement has not been submitted to the court, so that it is impossible to judge the truth of these contentions. Nevertheless, it should be noted that the federal defendants have not disputed *amicus'* analysis of HUD's authority to compel compliance with the Regulatory Agreement.

There does not appear to be any real dispute that many of the units at Oxford Village Townhouses are in need of repair, especially with respect to plumbing, firehazards, and insulation. Testimony at the May 3 hearing revealed, however, that many of the needed repairs are the result of latent defects in the construction of the project. In its brief in opposition to preliminary relief, HUD has confirmed the existence of such defects by submitting the affidavit of one Jack M. Kennedy, a HUD loan specialist. This affidavit states that a "9th month guarantee inspection" of the project was performed in March of 1974, and that the inspection uncovered a number of construction defects. Copies of the inspection report were sent by registered letter to FCH (on behalf of the mortgagor, Oxford, with instructions to "assure that the contractor will complete all required work" prior to June of 1974, the date of the "12 month guarantee inspection"), to the contractor (with a demand that the defects be corrected without delay prior to June of 1974), and to the surety and mortgagee (with advice that demand has been made on the contractor). The affidavit further indicates that if the defects are not cured by the June inspection, the parties will be given thirty days in which to complete all corrective work. HUD does not elaborate on what will follow after the thirty day period if the defects are not cured, but we presume that HUD could at that time exercise its power to declare the mortgage in default at that time.

■ Although the court has the power to order Oxford and FCH to use their best efforts to ensure that the project is brought up to an acceptable level of repair, we are reluctant to exercise that power in the absence of any showing that HUD is not acting to correct the above-described defects. Kennedy's affidavit (the truth of which has not been disputed) indicates that such efforts are presently being made. Further, it appears reasonable to this court that HUD would allow the private defendants a period of time in which to correct the defects, rather than immediately declaring the mortgage in default and taking over the operation of the property. Such a precipitous move would, in the opinion of this court, defeat one of the major purposes of Section 236—that is, to engage private industry in the provision of low-cost housing. Therefore, until it can be shown that HUD is not using its available powers to cause the private defendants to remedy the defects, the court feels that preliminary injunctive relief would be inappropriate.

(3) *Restraining the Board of Directors of Oxford from engaging in any official business until it is properly constituted.*

■ No proof whatsoever, either in the form of testimony or affidavits, has been offered to show that the present Board of Directors of Oxford is improperly constituted. Until such proof is offered, the court will not consider the question of injunctive relief.

E. SUMMARY.

In sum, the court has today:

Granted Atlanta Legal Aid Society's motion to appear as *amicus curiae*.

Granted plaintiffs' motion for preliminary injunctive relief with respect to the carrying charge increase issue;

Denied plaintiffs' motion for preliminary injunctive relief with respect to the

issues of constructive eviction and the improper constitution of Oxford's Board of Directors; and

Denied the motion to dismiss for lack of subject matter jurisdiction.

It is so ordered.