Jeffrey **BOLTHOUSE** and Miguel
Grimaldo, Plaintiffs,

v.

**CONTINENTAL WINGATE CO., INC.,**
and Village Green Management
Co., Defendants.

No. G86–831.

United States District Court,
W.D. Michigan, S.D.

March 27, 1987.

Legal Aid of Western Michigan by Michael Nelson, Grand Rapids, Mich., for plaintiffs.

White, Smitter & Walters by George O. Walters, Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

Two handicapped individuals, Jeffrey Bolthouse and Miguel Grimaldo, bring this action alleging that they were denied federally subsidized apartments solely because of their handicaps under both Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and the Michigan Handicappers Civil Rights Act, M.C.L.A. 37.1101 *et seq.* Plaintiffs seek both injunctive relief and damages. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(4) and has pendent jurisdiction over the state law claim.

Plaintiff Jeffrey Bolthouse suffers from schizophrenia for which he has been receiving treatment for more than twelve years. Plaintiff Miguel Grimaldo suffers from cerebral palsy since birth and is confined to a wheelchair.

Defendant Continental Wingate Co. is a corporation doing business in Kent County, Michigan and is the owner of Camelot Woods Apartments. Defendant Village Green Management Company is a corporation doing business in Kent County. Village Green manages Camelot Woods Apartments.

Camelot Woods is a housing complex for low and moderate income citizens which consists of some 300 units including one, two, and three-bedroom apartments. Camelot Woods receives federal financial assistance from and is regulated by the U.S. Department of Housing and Urban Development (HUD) under Section 8 of the New Construction Program.

Plaintiffs allege that defendants' refusal to rent to them because of their handicaps excludes them from federally subsidized housing in violation of their rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, applicable to Section 8 Housing pursuant to 24 C.F.R. § 881.-210(G). The matter is before the Court today on the narrow question of plaintiffs' request for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure (F.R.Civ.P) requiring that defendants lease plaintiffs Section 8 apartments at Camelot Woods.

Plaintiffs recognize that their request cannot interfere with the rights of other tenants already residing at Camelot Woods and do not suggest that any tenants be displaced, but merely ask this Court to order defendants to notify plaintiffs' counsel as soon as apartments become available. Specifically, plaintiff Miguel Grimaldo seeks the first barrier-free apartment, while plaintiff Jeffrey Bolthouse requests that defendants offer the first nonbarrier-free apartment to him.

### Discussion

As a threshold issue defendants raise the question of the exhaustion of administrative remedies. Specifically, defendants ar-

gue that Rule 2–18 of the HUD Rule Book directs that complaints alleging violations of Civil Rights Laws be submitted to HUD's Regional Offices of Fair Housing and Equal Opportunity for action. See Affidavit of Carol Kennedy at 1, Exhibit A. Defendants cite no other authority for its proposition that plaintiffs must exhaust administrative remedies before bringing a private action under Section 504 of the Rehabilitation Act.

It is clear to this Court that the HUD Rules are designed to inform HUD of allegations of violations of Civil Rights Laws and are not designed as part of the administrative appeals process that plaintiffs must exhaust before bringing a private cause of action. Further, those Rules relate to the administrative remedy of the possible termination of federal funding—a remedy which might not provide *any* relief for the plaintiff.

In any event, in *Sanders by Sanders v. Marquette Public Schools,* 561 F.Supp. 1361 (W.D.Mich.1983), Judge Hillman analyzed the legislative history behind the Rehabilitation Act and found that plaintiffs may sue directly under the Rehabilitation Act and that exhaustion of administrative remedies is not a condition precedent to bringing such a suit. Judge Hillman's conclusion was unequivocal.

> I find that there is no exhaustion requirement as a precondition to suit under the Act. There is no such requirement in the Act itself, no legislative history has been presented to support such a view, and the regulations under the Act are directed towards the procedures by which public agencies, not private individuals, may enforce the Act.

561 F.Supp. at 1369. I agree with Judge Hillman's analysis. Plaintiffs are not required to exhaust their administrative remedies before bringing suit under Section 504.

Defendants also argue that this suit is premature because as a result of the "appeal" of plaintiff Bolthouse, his application is being reconsidered and additional medical information has been requested. Similarly, defendants argue that based on plaintiff Grimaldo's "appeal," his application is also being reconsidered. The Court believes that defendants' apparent reconsideration is based solely on the plaintiffs' "appeal" to the courts for relief, and, in any event, the "appeals" issue is resolved by Judge Hillman's analysis.

## JEFFREY BOLTHOUSE

Plaintiff Jeffrey Bolthouse is a low or moderate income citizen who is otherwise qualified for Section 8 housing assistance. He asserts and testifies here that he is capable of living independently and in fact has been living independently for several years. Plaintiff Bolthouse further alleges and has testified that on or about 1984 he applied to Camelot Woods for a subsidized apartment. At that time he was told that there were no available apartments and that his application would be placed on a waiting list. Approximately two years later, in June, 1986, he was informed by a manager or assistant manager of Camelot Woods that his application had come to the top of the waiting list and that an apartment was available. Bolthouse contacted Camelot Woods and completed the application. He was told that he would be allowed to rent a Section 8 apartment beginning July 1, 1986.

However, on or about June 20, 1986, Bolthouse received a letter from Carol Kennedy, resident manager of Camelot Woods, reporting that his application was denied. The form letter indicated that "health" was the reason for the denial. See Exhibit A attached to Affd. Carol Kennedy.

Approximately two weeks later, on July 2, 1986, plaintiff's physician, Elbin Orellana, M.D., wrote to Ms. Kennedy in an attempt to clarify what Dr. Orellana believed was a misunderstanding concerning his original statement that Mr. Bolthouse required "occasional supervision." Dr. Orellana's letter included the following: "[b]ased on my clinical observation and treatment of Mr. Bolthouse as well as his considerable skills in apartment living, I see no reason why he would not be an appropriate Camelot Woods' tenant.... If he were to reside at Camelot Woods, he would require no direct supervision from

your staff. Mr. Bolthouse receives the minimal supervision he requires *via* biweekly contacts with the staff of the Harbinger Assertive Community Treatment Program. Harbinger provides a 24–hour a day on-call service in the event that its members need additional support." See Exhibit B to Plaintiff's Verified Complaint.

Soon thereafter, Michael Kivinen, a social worker, contacted Allen Kahn, an employee or officer of defendant Village Green. At this point, Mr. Kahn agreed to reinstate Bolthouse on the waiting list but stated that his application would go to the bottom of the list.

Plaintiff Bolthouse alleges that the defendants' refusal to rent Section 8 housing to him seriously impairs his ability to obtain safe, decent and affordable housing. He further alleges that in Section 8 housing, his housing costs would be limited to no more than thirty percent (30%) of his adjusted income.

*Application Procedures*

Defendants assert that Camelot Woods usually has a waiting list of 90 to 125 names for a one bedroom apartment; 500 names for a two-bedroom apartment; and 90 to 100 names for a three bedroom apartment. To enter Camelot one must wait from one to two years for a one or two bedroom apartment and for five years for a three bedroom apartment.

Defendants describe the application process as follows: 1) An applicant for an apartment first completes a pre-registration letter and is then placed on the waiting list. 2) As Camelot Woods receives notice that a vacancy is about to occur, the management office calls applicants starting from the name at the top of the list. Because of the long waiting period, applicants who are first in line often can no longer be located and/or are no longer in need of housing. 3) When such applicants cannot be reached, the next name on the list is called.

Defendants state that there are eight barrier-free units suitable for handicapped persons at Camelot Woods. They also state that while there are presently sixteen disabled or handicapped persons in residence at Camelot Woods, it provides no nursing or personal care, and a resident must therefore be capable of living independently.

Defendants allege that on or about January 12, 1984, plaintiff Bolthouse submitted a pre-registration letter. On March 26, 1986, an inquiry was sent to Bolthouse inquiring if he wanted to remain on the waiting list. Defendants claim that they received no response for three weeks and that his name was removed. On May 21, however, they report that Bolthouse contacted Camelot Woods and filled out another pre-registration letter at which time his name was returned to the list. Defendants state that they asked Bolthouse at that time whether he had any disabilities and that he replied "bad back." Plaintiff Bolthouse did not claim to be handicapped because of mental illness. There is actually no dispute as to this version of Bolthouse's interaction with a representative of Camelot Woods.

Defendants assert that when Bolthouse's application was reviewed for a tenancy that was about to occur, they received a letter from Dr. Elibin A. Orellana which stated that Bolthouse was a chronically ill person who required occasional supervision. *See* Exhibit B attached to Affidavit of Carol Kennedy. Defendants state that they then sent a denial notice to Bolthouse based on this letter. Based on the "appeal" of Bolthouse, defendants state that the application is currently being reconsidered, and they have requested—both in their pleadings and at oral argument—additional information from Mr. Bolthouse.

Mr. Bolthouse testifies—and the Court finds it to be a fact—that he did not wish to call attention to his chronic schizophrenia and did not, in fact, completely reveal his situation.

Evidence indicates that his caseworker subsequently advised him that he should make his condition known to the defendants. And he did make it known to the defendants—that is why he was denied residence originally.

## MIGUEL GRIMALDO

Plaintiff Miguel Grimaldo states that he is a low income citizen who is otherwise qualified for Section 8 housing. Although severely handicapped, Grimaldo has undergone extensive training to learn the skills necessary for independent living and is able to live independently with the aid of support services.

On or about June 16, 1986, Camelot Woods informed plaintiff Miguel Grimaldo that a barrier-free apartment was available. Grimaldo completed the application forms and was told that he could rent the apartment.

On June 16, 1986, Grimaldo was granted a certificate of eligibility for Section 8 housing by the Grand Rapids Housing Commission after Grimaldo had been on the Grand Rapids Housing Commission waiting list for about one year. Under the terms of the certificate Grimaldo was given sixty (60) days to find acceptable housing. If at the end of that time he did not find such housing, he would lose his eligibility for Section 8 Housing Assistance.

Because he had been told that he would be able to rent a barrier-free apartment at Camelot Woods, plaintiff did not look for private housing in which to use his Section 8 certificate.

On or about July 30, 1986, plaintiff was informed orally by defendants' employees or agents that he would not be allowed to rent the apartment at Camelot Woods because of his handicap.

On July 30, 1986, he was informed in writing that he could not rent an apartment because "he would require assistance of trained animals—pets not allowed!" See Exhibit D to Plaintiff's Verified Complaint.

On August 12, 1986, Kate Pew, a witness in this case and then director of the Grand Rapids Center for Independent Living, wrote to the manager of Camelot Woods on Grimaldo's behalf. She explained that while Miguel's disability is severe, "Mr. Grimaldo could not be a better example of someone who can live independently. He is capable of, and has succeeded in hiring his own personal care attendent [sic]; an attendant that will be his 'arms and legs' allowing him to live the independent lifestyle that is his right." See Plaintiff's Complaint Exhibit E.

Plaintiff adds that he does not own a dog but admits that he had hoped to eventually acquire a trained support dog—but not for at least two years. Plaintiff further alleges that he had offered to accommodate defendants' pet policy in a number of ways, and that defendants' refusal to rent is a pretext for unlawful discrimination on the basis of handicap.

Defendants state that Grimaldo has not been on the waiting list, but rather that on or about June 16, 1986, Cara Lafler, Camelot Woods office employee, called the Grand Rapids Center for Independent Living and advised them that there would be a barrier-free apartment available, and asked if the Center had a disabled person who would qualify.

The Center recommended plaintiff Grimaldo. Ms. Lafler requested that Grimaldo come to Camelot Woods to fill out an application, but the Center responded that it would be too difficult for Grimaldo to do that. Consequently, on June 17, 1986, the Center completed the application and rental agreement for him.

Camelot Woods then conducted a home interview on July 29, 1986. Grimaldo received a score of eighteen (18) out of a possible twenty-four (24) on the home interview form. (The minimum criterion for residence at Camelot Woods is a score of twenty (20)). See Exhibit C, Initial and Recertification Home Interview Form attached to Affidavit of Carol Kennedy. Moments before this hearing began, defendants submitted another home interview form on which Miguel Grimaldo received a score of eleven (11) out of a possible twenty-four (24).

Defendants also state that the Center informed Camelot Woods that plaintiff Grimaldo would have the assistance of trained animals. Finally, defendants again emphasize that they have not refused to rent an apartment to either plaintiff, but rather have retained both plaintiffs on the waiting

list and are taking steps to further evaluate each of them.

### Standard

It is the well established rule in the Sixth Circuit that a district court must consider the following four elements in deciding whether to issue or withhold a preliminary injunction.

1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the movant has shown irreparable injury.

3. Whether the preliminary injunction could harm third parties.

4. Whether the public interest would be served by issuing the preliminary injunction.

*Mason County Medical Ass'n. v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). The appellate court has recently reaffirmed that the *Mason County* criteria do not constitute a "rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief, [rather] the four considerations ... are factors to be balanced, not prerequisites that must be met." *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985). The emphasis on balancing the four factors in the *Frisch* opinion could suggest that a particularly strong showing of irreparable injury would lessen the moving party's burden of showing a "substantial likelihood or probability of success on the merits."

### Discussion

I. *The Likelihood of Plaintiffs' Success on the Merits*

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 prohibits discrimination solely on the basis of handicap in programs receiving financial assistance.

No otherwise qualified handicapped individual in the United States, as defined in section 7(7) [29 U.S.C.S. § 706(7)], shall solely by reason of his handicap be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by .. any Executive Agency or by the United States Postal Service.

Moreover, the courts have been nearly unanimous in asserting that Section 504 provides a private right of action for injunctive relief by handicapped individuals. *Sanders by Sanders, supra,* at 1368. See also *Jennings v. Alexander,* 715 F.2d 1036 (6th Cir.1983).

In order to prevail, the following three elements must be established: first, that the defendants receive federal financial assistance; second, that plaintiffs are handicapped individuals under the Act; third, that plaintiffs are an "otherwise qualified individual[s]" within the meaning of the Act; and fourth, that defendants seek to exclude the plaintiffs solely because of their handicap. *Strathie v. Department of Transportation,* 716 F.2d 227 (3d Cir.1983).

1) Defendants do not contest that Camelot Woods receives substantial financial assistance under U.S. HUD pursuant to the Section 8 program or that the HUD regulations establish that the Rehabilitation Act applies to Section 8.

2) The pertinent language of 29 U.S.C. § 706(7)(B) defines a handicapped person as follows:

(B) Subject to the second sentence of this subparagraph, the term "handicapped individual" means, for purposes of titles IV and V of this Act [29 U.S.C. § 780 et seq.], any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

 Miguel Grimaldo has suffered from cerebral palsy since birth, and is confined to a wheelchair. Jeffrey Bolthouse suffers from schizophrenia—a serious form of mental illness. Both plaintiffs have been found disabled from performing substantial and gainful activity by the Social Security Administration. Plaintiffs argue, and the Court agrees, that there can be no doubt that they are handicapped individuals

within the meaning of the Act. *See Doe v. Region 13 Mental Health-Mental Retardation Com'n.*, 704 F.2d 1402 (7th Cir.1983), *reh'g denied*, 709 F.2d 712 (7th Cir.1983).

3) Defendants specifically reject plaintiff's contention that plaintiffs are "otherwise qualified" to rent and live in Section 8 housing. Defendants admit that Grimaldo is eligible for Section 8 housing based on his income but deny that Kate Pew's letter of August 12, 1986 to Carol Kennedy (Plaintiff's Exhibit C) which describes Grimaldo's disability also establishes that he is an "otherwise qualified" handicapped person under the Rehabilitation Act of 1973. Defendants also find support for their contention that Grimaldo is not "otherwise qualified" by the fact that Grimaldo scored only eighteen (18) points out of possible twenty-four (24) on the Initial and Recertification Home Interview Form (Defendants' Exhibit C), when the minimum criterion for Camelot Woods is a score of twenty (20). See Affidavit of Carol Kennedy at 4.

The "Initial and Recertification Home Interview Form" has three columns. The first column lists four general categories: 1) household; 2) personal appearance; 3) attitude and manner; and 4) transition, as well as various related subcategories. The second column is entitled "interviewer's impression." In this column the interviewer is required to circle either Good (2 points), Fair (1 point), or Poor (0 points). Each general category and impression grading is linked with a third column entitled "Guideline" which functions to assist the interviewer in choosing a number.

For example, under the general category Attitude and Manner there is listed a subcategory entitled Mobility. The Guideline lists "full mobility" as good which requires a score of 2. The guideline indicating "discomfort in movement/uses cane" corresponds to a finding of fair mobility and a score of 1. Similarly, the guideline indicating "chronically needs walker/wheel chair/has restricted movement" corresponds to poor and requires a score of 0.

Attached to the second Initial and Recertification Form of October 6, 1986 is another document entitled "Initial Home Inter-

view." Both of these documents were prepared by Ms. Marie McIntyre A.C.S.W. R.N., a certified social worker and registered nurse on the staff of the Rehabilitation Institute, Detroit, Michigan, who was retained by defendants to evaluate plaintiff Grimaldo. See Second Aff. of Carol Kennedy.

The Court notes that both the second Initial and Recertification Home Interview Form as well as the Initial Home Interview Form were prepared by the same person, Ms. McIntyre, on October 6, 1986, at which time she interviewed plaintiff Grimaldo at his current residence, 1670 Herrick St., Grand Rapids, Michigan. On the Home Interview Form, which uses a somewhat different scoring index, Ms. McIntyre indicated that there were no readily visible "pests." Ms. McIntyre in fact indicated under a category entitled "living skills," that Mr. Grimaldo should receive five (5) points, a superior rating, because—as she has indicated in her own handwriting: "there are no pests visible or problem." See Second Aff. of Carol Kennedy, Ex. B.

However, on the "Initial and Recertification Home Interview Form" under the subcategory of pests (insect or rodent) Ms. McIntyre indicated that plaintiff Grimaldo should receive a poor rating (0 points), a finding which corresponds to the guideline: "obvious pest problem with little or no attempt to solve problem."

Defendants could offer no explanation for these contradictory evaluations and ratings. The Court finds that the second Initial and Recertification Home Interview Form dated October 6, 1986, on which Mr. Grimaldo received a score of eleven (11) out of a possible twenty-four (24), as well as the Home Interview Form filled out on the same date, to be documents prepared solely for the purposes of this hearing, and the Court cannot give any credence to them for the reasons previously stated.

In addition, the Court notes that the first Initial and Recertification Home Interview Form filled out on July 29, 1986, by a representative of Camelot Woods, Ms. Ginny Reed M.S.W., while Mr. Grimaldo was at a different residence, indicated that he

received eighteen (18) out of twenty-four (24) points. The Court notes that while a potential resident must score twenty (20) in order to enter Camelot, under the established scoring "Guidelines," Mr. Grimaldo performed about as well as he possibly could considering his handicaps. Since Mr. Grimaldo is confined to a wheelchair, the guidelines mandated that he would receive a rating of poor ("0" points) in the subcategory of Mobility. Further, under the subcategory, "Ability to Cope," Mr. Grimaldo had to receive another rating of poor ("0" points) since the guidelines indicate that a finding that a potential resident is "definitely in need of outside support system" requires that rating and score.

Thus, it is apparent that Mr. Grimaldo actually received eighteen (18) points out of a possible twenty (20) points, not a possible twenty-four (24) points. A quick mathematical calculation establishes that Mr. Grimaldo's eighteen (18) out of a possible twenty (20) points actually represents a higher percentage score than does twenty (20) points out of twenty-four (24), twenty (20) being the minimum "raw score" required of a prospective Camelot resident. The Court notes that it is hard to see how the use of this evaluation system as currently structured can be anything but discriminatory *per se* within the meaning of the Act. It functions not to accommodate, but rather to exclude those persons with handicaps. Even when a fair-minded interviewer, as the first interviewer, Ms. Reed, apparently was, applies the guidelines, the application of the guidelines results in discrimination solely because of handicap.

Consequently, the Court finds that it cannot place any weight on either the affidavit of Ms. Carol Kennedy, or the affidavit of Ms. Ginny Reed. However, the Court notes that based on its analysis outlined above, Ms. Reed's affidavit actually indicates that plaintiff Grimaldo was "technically" qualified for residence even under Camelot Wood's own scoring index.

Further, I find that the "no pets" issue is not really at issue since plaintiff Grimaldo does not currently own a pet and does not plan on owning a pet for at least two (2) years.

Defendants also argue that the reason plaintiff Bolthouse was sent a denial notice was that Dr. Elbin A. Orellana sent a letter stating that Mr. Bolthouse was a chronically ill person who required occasional supervision. However, Dr. Elbin sent another letter which defendants did not discuss in their brief. This follow-up letter indicates that Dr. Orellana wished to clarify what he believed to be an apparent misunderstanding of his earlier written statement that Mr. Bolthouse needed "occasional supervision." Dr. Orellana unequivocally states that "[he sees] no reason why [Mr. Bolthouse] would not be an appropriate Camelot Woods' tenant." See letter from Dr. Orellana dated July 2, 1986, Plaintiffs' Exhibit B. In addition, Michael Kivinen, a social worker at Harbinger, has also testified that Mr. Bolthouse requires only occasional supervision and that Harbinger can provide such supervision without any inconvenience to Camelot Woods.

In determining whether an individual is "otherwise qualified," the Supreme Court has indicated that an individual is not otherwise qualified if accommodating the plaintiff would impose an "undue burden" on the defendant. *Community College v. Davis*, 442 U.S. 397 (1979). Stating the matter somewhat differently, plaintiffs argue that it is not necessary that a handicapped person be able to perform all the activities of a non-handicapped person. Rather, plaintiffs reason that defendants are obligated to reasonably accommodate plaintiffs' handicap. *Majors v. Housing Authority of DeKalb, Georgia*, 652 F.2d 454 (5th Cir.1981). Plaintiffs further argue that accommodation is unreasonable only if it would impose an undue burden, such as extensive financial cost, on the defendants.

Here plaintiffs seek only those apartments—including barrier-free apartments—which it normally supplies to other tenants. To accomodate plaintiffs would impose no financial or administrative burden on defendants.

Further, plaintiff Bolthouse receives counseling and treatment at the Harbinger

program. This ongoing treatment—parts of which are available to him on a twenty-four (24) hour basis—is provided without any cost to the defendants and imposes no administrative burdens on defendants.

Miguel Grimaldo does require assistance to perform necessary daily activities. That assistance would have to be provided by community agencies and personal attendants, and the Court believes that he would need twenty-four (24) hour a day supervision in the form of personal attendants and at least one back-up in the event that one or more of those attendants could not be with him. But again, that does not impose any financial or administrative burden on defendants.

4) In determining whether defendants have refused to rent to plaintiffs solely because of their handicap, the Court must make a factual finding as to what the agents and employees of Camelot Woods wrote on their denial forms and what they said to plaintiffs Bolthouse and Grimaldo. I must also evaluate defendants' claim that they are still evaluating plaintiffs, and that their applications are still being evaluated. On the latter point—which is essentially defendants' claim that they did not refuse to rent to plaintiffs ... I find that the "appeals process" which defendants suggest is in progress is but a pretext, an attempt to deflect the Court's attention away from defendants' earlier decision to deny apartments to plaintiffs. The Court believes that the "appeals process" which has captured defendants' attention is the appeal by Mr. Grimaldo and Mr. Bolthouse to this Court for injunctive relief.

In addition, I have listened to the testimony, and I have examined the affidavits at great length, both prior to and at today's hearing with respect to what actually happened. As far as Miguel Grimaldo is concerned, I view the most recent affidavit submitted by Ms. Carol Kennedy as mere "bootstrapping," an attempt to lower his otherwise eighteen (18) points to eleven (11), and that the submission of that affidavit is some evidence of defendants' desire not to rent to Mr. Grimaldo because of his handicap.

■ With respect to Mr. Bolthouse, the Court rejects defendants' argument that further evaluation is necessary. Further, the Court finds that defendants have refused to rent to Mr. Bolthouse because the nature of Mr. Bolthouse's handicap, schizophrenia, may scare the defendants, as it does many other people. The testimony convinces me that defendants have refused to rent to Mr. Bolthouse and Mr. Grimaldo solely because of their handicaps.

On the whole, I find that plaintiffs have established each of the four elements necessary to demonstrate a strong likelihood of success on the merits.

## II. *Irreparable Injury*

■ Under Section 8 guidelines, plaintiffs are eligible to receive financial assistance to pay a portion of their housing costs based on their financial need. This Section 8 assistance is contingent upon plaintiffs' occupying eligible units. Each month that plaintiffs are denied occupancy in such apartments causes them to lose this financial assistance.

It might be argued that if plaintiffs are found to have been victims of discrimination based upon their handicaps, they will eventually be able to receive financial compensation at the conclusion of the case. However, some courts have found that denial of housing assistance to low income tenants causes irreparable harm even where a plaintiff has the prospect of recovering monetary damages. *See Bloodworth v. Oxford Village Townhouses*, 377 F.Supp. 709, 719 (N.D.Ga.1974); *Keller v. Kate Maremount Foundation*, 365 F.Supp. 798, 803 (N.D.Cal.1972) *aff'd*, 504 F.2d 483 (9th Cir.1974).

In the context of a discussion of race discrimination in a Section 8 housing project, other courts have noted that "[t]he strong national policy against race discrimination in housing leads the court to conclude that once a plaintiff has demonstrated the likelihood of success on the merits of a claim of housing discrimination, irreparable injury must be presumed. *See Banks v. Pe[r]k*, 341 F.Supp. 1175 (N.D.Ohio

1972), *aff'd in part* and *rev'd in part,* 473 F.2d 910 (6th Cir.1973) (mem.)." *Gresham v. Windrush Partners Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984) (quoting the unpublished district court opinion).

The Eleventh Circuit in *Gresham* went on to discuss some of the reasons that irreparable injury may be presumed once plaintiff establishes that discrimination has occurred and that fair housing statutes have been violated.

First, a person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter. He or she must find housing elsewhere, and once that housing is found, even if in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again.

Second, ... available housing where the discrimination is occurring may become filled during the pendency of a lawsuit, making corrective relief nearly impossible to enter ... [since] ... a court lacks authority to order innocent white tenants to vacate apartments to remedy discrimination against blacks or other minorities by the apartment management....

Third, monetary relief cannot correct the injury completely ... [for example] ... the loss of housing which is accessible to jobs; and the loss of being unable to escape the never-ending and seemingly unbreakable cycle of poverty.

730 F.2d at 1424. Plaintiffs argue that the Court should adopt the reasoning that *Gresham* applied to racial discrimination to that of discrimination against handicapped persons. The Court agrees that the basic principles the *Gresham* court articulated in its discussion of racial discrimination in Section 8 housing are applicable here.

The Court takes judicial notice of the long-standing societal prejudice against and misunderstanding of the handicapped and mentally-ill. These crippling misperceptions have in turn conferred upon the handicapped the undeserved status of second-class citizens.

Periodically, there is a public outcry of concern for the plight of the mentally ill and the handicapped and how they have been merely warehoused—put out of public view—and possibly mistreated in under-staffed and uncaring public institutions. There appears a movement to return the handicapped to the community to receive treatment and rehabilitation. This latter solution is often accompanied by—indeed some would say—it is proposed because of public concern over the apparently debilitating effect that the operation of these large public institutions has on the precarious health of the public fisc.

The question of whether or not community treatment is more cost effective or whether or not it is a more effective treatment modality quickly becomes moot because community treatment is routinely met with community resistance. The public appears not to want the so-called handicapped in public view after all. A counter-movement emerges and there is a public outcry to return the "handicapped" to the institutional setting because they cannot cope and/or do not belong in the community. It is then suggested that the handicapped need the professional and institutional support services only a large institution can provide.

When plaintiffs such as Miguel Grimaldo and Jeffrey Bolthouse attempt to break out of this imposed life-cycle of diminished expectations and make the effort to take an innovative step towards self-help and independent living—with only that amount of supervision which their handicap demands, they find that they are further handicapped by the Catch–22 of being told they are unqualified—*because* of their handicap—to receive housing assistance which they are *entitled* to receive ... *because* of their handicap. And so it goes. But this cycle of misperception must stop.

Can anyone expect the optimism and positive outlook, the desire for independent living which the initial interviewer, Ms. Woods, noted on the Camelot Woods's home interview form—an optimism which we have seen expressed here today—to continue when Miguel Grimaldo's efforts at independent living are stymied because of the results of a screening procedure which

on its face found, on the one hand, that he is a "good" candidate overall, but, on the other hand, that because of his basic immobility he is not—in Camelot Woods's view—"otherwise qualified" to rent a Section 8 apartment?

The Court believes such psychological setbacks and emotional losses are precisely the type of irreparable harm that the *Gresham* court suggested other courts address and enjoin. The Court thinks both plaintiffs have demonstrated, for the reasons stated above, that they will suffer irreparable injury unless defendants' continued discriminatory practices are enjoined.

### III. *Substantial Harm to Third Parties*

Defendants state that there are already a number of handicapped individuals living at Camelot Woods. Defendants also suggest that they currently have barrier-free apartments. In fact, defendants asserted in their answer that they initiated the contact with Mr. Grimaldo through the Grand Rapids Center for Independent Living. Moreover, the Court agrees with plaintiffs that defendants cannot claim that they will be harmed by complying with the Rehabilitation Act since an injunction will only require that which the law already requires. *See Hunt v. United States Securities and Exchange Commission*, 520 F.Supp. 580, 609 (N.D.Tex.1981). Defendants will suffer no administrative or financial costs if an injunction is issued.

### IV. *The Public Interest*

The plain words and very passage of the Rehabilitation Act imply that it is the public's attitude towards the handicapped that is in most need of rehabilitation. Unable to remove the handicaps nature has bestowed upon individuals by legislative fiat, Congress unequivocally intended to remove those societal impediments that prevent handicapped individuals from securing equal access to all opportunities and benefits which society provides—including those government programs for which they are qualified.

The Congressional findings expressed in The White House Conference on Handicapped Individuals Act outline the basic policies and purpose of the Rehabilitation Act of 1973.

(4) ... it is of critical importance to this nation that equality of opportunity, equal access to all aspects of society and equal rights guaranteed by the Constitution of the United States be provided to all individuals with handicaps;

. . . . .

(6) ... it is essential that recommendations be made to assure that all individuals with handicaps are able to live their lives independently and with dignity, and that the complete integration of all individuals with handicaps into normal community living, working, and service patterns be held as the final objective; and

(7) ... all levels of Government must necessarily share responsibility for developing opportunities for individuals with handicaps; and it is therefore the policy of the Congress that the Federal Government work with the States and their citizens to develop recommendations and plans for action in solving the multifold problems facing individuals with handicaps.

Rehabilitation Act Amendments of 1973, Pub.L. 93–516, Title III § 301, 88 Stat. 1631 (1974) (codified at 29 U.S.C. § 701 note). It is beyond argument that granting the relief sought by plaintiffs furthers this public purpose.

"Camelot" conjures up images of a community in balance. In literature it often invokes dream-like images of "the perfect" community. In contemporary times, it was often used to characterize the goals and ideals espoused during the Kennedy years. It connotes a yearning for a society of equal justice under law, a society without discrimination, an attempt to put the highest social ideals into practice in the real world.

Jeffrey Bolthouse and Miguel Grimaldo wished to enter Camelot Woods; they were denied entrance at the gate because of their handicaps. They have turned towards the courts for relief. It is not within this Court's power to make their world a

perfect one—nor do they ask for such relief. They merely ask to be given the opportunity to make their lives a little easier by entering the community/complex of Camelot Woods. It is within the Court's power to grant that wish.

Accordingly, plaintiffs' motion for a preliminary injunction is granted.

Finally, the Court notes that this written opinion is intended to supplant the oral opinion delivered from the bench following the presentation of evidence and oral argument which took place at the October 8, 1986 hearing.